UNITED STATES of America, Plaintiff,

v.

**Ralph E. SHUCK, Defendant.**

**Crim. No. 85–54.**

United States District Court,
N.D. West Virginia,
Elkins Division.

Feb. 7, 1989.

William A. Kolibash, U.S. Atty., and David E. Godwin, Asst. U.S. Atty., Wheeling, W.Va., for plaintiff.

Thomas Dawson, Leavenworth, Kan., Harry Smith, Elkins, W.Va., for defendant.

## MEMORANDUM OPINION

MAXWELL, Chief Judge.

In this post-conviction proceeding the Defendant is limited in his prayer for relief to the issue of whether prosecutorial misconduct undermined the validity of a grand jury proceeding and, in turn, resulted in his being indicted by a subsequent Grand Jury and later convicted of perjury. While the cause of action here is essentially limited to a fundamental determination of events occurring before the initial Grand Jury, the Court has also received testimony which is circumstantially relevant to the issue presented in that it reflects other unacceptable practices of the Office of the United States Attorney for this district (including unprincipled attacks upon defense counsel, misrepresentation of the record to judicial officers, and other equally inappropriate conduct), the pragmatic effect of which buttresses Defendant's claim of constitutional violations involving his grand jury appearance. Upon consideration of the voluminous record of this post-conviction proceeding, the Court finds Defendant's motion to have merit and, in keeping with 28 U.S.C. § 2255, appropriate relief is granted.

### I.

Ralph Edward Shuck, Defendant in the above-styled criminal matter, was subpoenaed to testify before a Federal Grand Jury in this district on June 25, 1984. On the morning of Shuck's scheduled appearance Harry A. Smith, III, counsel for Defendant, contacted Thomas O. Mucklow, Assistant United States Attorney for the Northern District of West Virginia (AUSA), and advised him that Shuck intended to rely upon the guarantees of the Fifth Amendment at his grand jury appearance. The AUSA advised Mr. Smith that he preferred that Shuck appear as subpoenaed and exercise this right before the Grand Jury itself; however, it appears that other members of Shuck's family were excused from grand jury appearance by another Assistant United States Attorney when Mr. Smith indicated their intent to rely upon the Fifth Amendment.

At the appointed hour Shuck was called before the Grand Jury while his attorney remained available for consultation outside the grand jury room. At the outset of Shuck's grand jury appearance the AUSA instructed him as follows:

Mr. Shuck, I am going to advise you of your rights at the present time. You have the right to remain silent. Basically what that right is, you have the right to refuse to answer any question which would incriminate you. You do not have the right to refuse to answer questions that would incriminate someone else, and if you have knowledge of a violation, you do not have the right to invoke your Fifth Amendment privilege to protect another individual. You do have the right to have an attorney, and seek the advice of an attorney. You do not have the right to have an attorney in this room. However, you do have the right to have an attorney with you outside, and you have a right to consult with that attorney at such point in time as you would not understand a question, or you would want to consult as far as your answer is concerned. Do you have an attorney?

A. Yes, sir.

Q. What is his name?

A. Harry Smith.

Q. Is Mr. Smith with you today?

A. Yes, sir.

Q. Is he outside this room?

A. Yes, sir.

Q. I am also going to advise you as to what perjury is. Perjury is lying or giving a materially false statement to this Grand Jury. Basically, if you would tell this Grand Jury anything that was not the truth, or that would be designed in such a way as to mislead them in their investigation, you could be charged with perjury, and that is a serious felony under the federal system. Are you aware of that?

A. Yes, sir.

Testimony of Ralph Edward Shuck, June 24, 1984, at 3–5.

During the course of Shuck's testimony the following exchange, in pertinent part, took place between the AUSA and Shuck:

Q. Have you ever been involved in the growing and processing of marijuana?

A. I decline to answer that question on the grounds it might tend to incriminate me.

Q. Have you ever participated in the sale or distribution of marijuana?

A. I decline to answer on the grounds it might incriminate me.

Q. Have you ever been involved in the sale and distribution of any other controlled substance, such as cocaine, heroin, speed, anything like that?

A. I decline to answer on the grounds it might incriminate me.

Q. Mr. Shuck, is it your intention to invoke your Fifth Amendment privilege to each and every question that I may ask you concerning your involvement with controlled substances?

A. Yes, sir.

Q. Are you aware of any type of marijuana farming operations?

A. I decline to answer that on the grounds it might incriminate me.

Q. Mr. Shuck, I will advise you again that you have the right to invoke your Fifth Amendment privilege to protect yourself, but not to protect anyone else. Do you understand that?

A. Yes, sir.

Q. Is that still your intention to invoke your Fifth Amendment privilege?

A. Yes, sir.

Q. Are you familiar in any way with the cultivation and harvesting of marijuana?

A. I decline to answer that on the grounds that it might incriminate me.

. . . . .

Q. Have you ever made any money from the cultivation, sale or distribution of any controlled substances?

A. I decline to answer that because it might incriminate me.

Q. Did you report any income that you might have made from cultivation, sale or distribution of controlled substances to the Internal Revenue Service?

A. I decline to answer that on grounds that it might incriminate me.

Q. Have you ever used a telephone in order to participate or conduct a transaction involving controlled substances, specifically marijuana?

A. I decline to answer that on grounds that it might incriminate me.

Q. Have you ever traveled across the state lines for the purpose of cultivation or distribution of controlled substances?

A. I decline to answer that on the grounds that it might incriminate me.

Q. Do you know an individual by the name of Steven Berman?

A. No, I don't.

Q. Do you know an individual by the name of Steven Becker?

A. Yes, I do.

Q. How do you know Mr. Becker?

A. He is my brother in law.

Q. How long have you known him?

A. Ten years, I suppose.

Q. Is he married to your sister?

A. Yes, sir.

Q. Where does he live?

A. Philadelphia.

Q. Is he employed?

A. I decline to answer that on the grounds that it might incriminate me.

Q. I told you, Mr. Shuck, you have the right to protect yourself, but not your brother in law.

A. May I confer with my attorney?

Q. Yes.

The witness left the Grand Jury room.

After a few minutes, the witness returned to the stand.

A. What was your question again, sir?

Q. Mr. Shuck, you have had an opportunity to confer with your counsel?

A. Yes, sir.

Q. I believe I asked you whether or not you are familiar with a Steven Becker, and you indicated he was your brother in law, and you had known him about ten years, and he lived in Philadelphia, and then I asked you what type of business he was in, whether he was employed, and you took the Fifth. I will ask you again, do you know what type business he is in?

A. The only thing I can tell you about Steven, I don't know where he works, the only thing I know is he is in the clothing business. That's all I know about him.

Q. Do you know whether or not he has been involved in the cultivation of marijuana?

A. No, sir.

Q. You have no knowledge of that fact?

A. No.

Q. May I ask you why you took the Fifth?

A. Just confused, I suppose.

Q. Your brother in law, Steven Becker, to the best of your knowledge has no connection with the cultivation of marijuana?

A. To the best of my knowledge.

Q. Do you know whether or not your brother in law, Steven Becker, has any involvement in the sale and distribution of marijuana?

A. Not to my knowledge.

Testimony of Ralph Edward Shuck, June 24, 1984, at 10–15. In addition, Shuck testified that he had no knowledge of the involvement of certain other named individuals in the cultivation, preparation, or distribution of marijuana.

On June 7, 1985 a subsequently impanelled Grand Jury[1] returned a one-count Indictment charging Shuck with making false declarations before a Grand Jury in violation of Title 18, United States Code, Section 1623. On August 21, 1985, a Petit Jury found Shuck guilty as charged in the above-referenced Indictment. Upon his conviction Shuck was sentenced on October 30, 1985 to imprisonment for a period of three (3) years to be served in accordance with the provisions of 18 U.S.C. § 4205(a).

On October 28, 1986, his conviction having been affirmed by the United States Court of Appeals for the Fourth Circuit and the mandate having been received by this Court on July 8, 1986, Shuck filed a Second Motion Pursuant to Rule 35, Federal Rules of Criminal Procedure, seeking modification of his sentence to reflect imposition pursuant to 18 U.S.C. § 4205(b)(2) rather than 18 U.S.C. § 4205(a). The matter was initially heard by the Court on January 8, 1987 and, because the issues raised and suggested were broad in scope and complex in nature and appeared to call into question the propriety of certain governmental activity including, but not limited to, conduct attributed to the Office of the United States Attorney, the Court took the matter under advisement pending additional submissions of counsel.

Because of the seriousness of the allegations presented against the Office of the United States Attorney for this district in Defendant's Motion To Amend Pleadings, filed August 13, 1987; Petition Pursuant to 28 U.S.C. § 2255, filed September 21, 1987; and first and second supplements thereto filed on December 31, 1987 and January 11, 1988, respectively, the Court provided the parties additional opportunity to develop a

---

1. Ralph Shuck testified before a Grand Jury which was impanelled March 3, 1984 and continued in being until discharged from service on September 17, 1984. The Grand Jury which returned the indictment beginning this criminal action was impanelled on November 11, 1984 and was discharged from service on August 2, 1985. The record herein does not appear to contain the pertinent grand jury transcripts, if any there are, from the Grand Jury which returned the indictment in this matter.

full and complete record with respect to each of the allegations raised.

The last of many hearings was conducted in this matter on August 23, 1988 at which time the parties advised the Court that they had nothing further to present.[2] At the close of the said hearing the Court invited the parties to submit proposed findings of fact and conclusions of law and responses thereto, if any there were. The last of these was received on September 21, 1988 and on September 27, 1988 the Court ruled on Shuck's motion pursuant to Rule 35, Federal Rules of Criminal Procedure.[3] The Court now turns to the matters which are submitted for review pursuant to 28 U.S.C. § 2255.

## II.

As a preliminary matter, the Government argues that Shuck's claims concerning the alleged misconduct of the AUSA were not raised at trial or on appeal and that, therefore, Shuck must show both "cause" for his failure to raise the claims and "actual prejudice" resulting from the matter of which he complains.

To the contrary, at the trial of this matter Shuck asserted that the conduct of the AUSA during Shuck's grand jury appearance was prejudicial to his Fifth Amendment rights. Moreover, on appeal Shuck argued, among other things, that he had been prejudiced at trial by the introduction of portions of the grand jury transcript in which he had asserted his Fifth Amendment privilege. Brief for Appellant at 10–18, *United States v. Shuck*, No. 85–5269 [792 F.2d 140 (table)] (4th Cir., June 9, 1986) (UP). He also raised the notion that the AUSA acted improperly by pressuring Shuck into believing that he did not have the right to remain silent with regard to another's illegal act even if such testimony

would incriminate himself as well. *Id.* at 15.

While not developed to its present depth, the matter was undeniably raised both at trial and on appeal. In its Response to Defendant's Section 2255 Petition, filed May 27, 1988, the government concedes that this issue was brought to the attention of the Fourth Circuit but suggests that the claim lacked merit because the Court of Appeals did not credit the argument with any appellate discussion. In order to give the government's argument any weight, it must be assumed that the issue was fully developed, that the Court of Appeals had an opportunity to apply the appropriate principles of law, and that the record of the trial court was presented to the Court of Appeals for review. In light of the magnitude of the constitutional question presented and the state of the record of this matter at the time the direct appeal was taken, the Court will not presume that the Court of Appeals had the opportunity to consider the merits of the argument.

Therefore, the Court concludes that the "cause and actual prejudice" standard expressed in *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), would be inapplicable in the instant situation as the issue was raised both at trial and on appeal. With regard to the other allegations of prosecutorial misconduct presented here, cause and prejudice would not need to be demonstrated as these are claims which require independent development outside of and collateral to the criminal proceeding; thus, said claims are properly raised pursuant to 28 U.S.C. § 2255.

Generally, Shuck urges that a substantial abuse of investigative and prosecutorial authority is prevalent in the Northern Dis-

---

**2.** Although the government called the AUSA to the stand early in the development of the record herein, it curiously chose not to recall him in rebuttal after Shuck had indicated that the development of his evidence was complete. The government could have taken the initiative here to fully address each of Shuck's allegations. Because it has not done so, the record is left wanting in clarity and depth, revealing in many instances only what Shuck was able to unearth.

**3.** On October 25, 1988 the government filed a Notice of Appeal of the Court's order granting Shuck relief under Rule 35, Federal Rules of Criminal Procedure. On January 23, 1989 the appeal was dismissed upon agreement of the parties, pursuant to Rule 42(b), Federal Rules of Appellate Procedure.

trict of West Virginia. Indeed, through the development of the record in this matter, Shuck has particularized an alarming course of conduct which appears virtually unchecked. At best, the evidence presented details a cavalier disregard for the traditional principles of justice embodied in the recognized adversarial fact-finding process; at worst, it reveals a calculated abuse of the authority entrusted to the Office of the United States Attorney, the effect of which renders the adversarial process impotent.

While not necessarily dispositive of the issues of law arising from Shuck's petition, as supplemented, various aspects of the record now before the Court are recognized as demonstrative of the unprofessional "mind set" of the AUSA, most likely that of the Office of the United States Attorney and, unfortunately, also that of a very limited number of individuals who lack comprehensive federal law enforcement training but were nevertheless assigned to and functioned under the authority of the Office of the United States Attorney.[4] Moreover, these broader matters which have been presented lend credence to the arguments particular to Shuck, all of which place the credibility of the Office of the United States Attorney at issue in this proceeding and, indeed, raise substantial questions regarding the broader responsibilities of integrity which are entrusted to that office and its affiliates as public servants in the system of criminal justice.

## A. *Multiple District Prosecutions*

The record of this matter reveals the highly unusual circumstance of the AUSA prosecuting the matter in this Court, another criminal matter against a related defendant in the Western District of Virginia, and yet another criminal matter against this and related defendants in the Southern District of West Virginia. The AUSA has testified that he was appointed a Special Assistant in the Western District of Virginia and also in the Southern District of West Virginia by default when another Assistant United States Attorney from this district, who was originally assigned to prosecute those matters, had scheduling conflicts with other criminal trials in this district. The AUSA testified that he had been appointed Special Prosecutor in the Southern District of West Virginia several weeks, and perhaps a couple of months, before the Grand Jury actually met to consider those matters.

In spite of this testimony, it is clear from the exhibits tendered that the AUSA's appointment in the Southern District was on July 15, 1986, the day on which the Grand Jury convened. While the exhibit supports the position that his appearance before the Grand Jury was as a stand-in, it does not appear to substantiate his testimony with regard to the earlier date of his appointment.

The AUSA also testified that the decision to initiate the prosecution of the referenced matters in the respective districts, as well as the decision to have him prosecute the matters in the various districts, was that solely of the respective United States Attorneys for those districts and that he merely went to the districts and prosecuted the cases when he was told to do so. Shuck urges that the AUSA's circuit riding tends to substantiate his claim that the AUSA had a personal grudge against the Shuck family and would go to great lengths to ensure their prosecution.

Mary Elizabeth Hartley testified in this matter that she was acquainted with Michael Patrick Hogan, a witness who had offered both grand jury and trial testimony against Shuck. Hartley testified at an April 11, 1988 hearing that Witness Hogan had indicated to her that the government's attorney was "out to get Ralph Shuck" or something to that effect. On January 8,

---

**4.** While there has been general testimony to the effect that responsibilities of the Office of the United States Attorney do not include supervision of the Narcotics Task Force in this district, it must be recognized that the Office of the United States Attorney must, at least in a practical sense, provide legal advice and support to these individuals. If this leadership role is not assumed, and the Court takes no position on the evidence presented in this regard, a whole horizon of offensive activity, such as that presented in support of and collateral to this matter, may be the result.

1987 the AUSA had testified that he did not believe that he had ever acted outside the scope of his responsibilities under the supervision of the United States Attorney and that "[t]here is no personal significance with Ralph Shuck or anyone else. He's a criminal defendant. And I try to act accordingly."

### B. *Government Effort With Regard To Shuck's Detention*

#### 1. Motions Filed In This Court

In the Judgment and Probation/Commitment Order entered in this matter on October 31, 1985, the Court indicated that Shuck would be permitted to voluntarily report to the custody of the Attorney General at such time as an institution would be designated for him. Shuck argues that this "self report status" is viewed in his favor by the Bureau of Prisons in determining his suitability for a Federal Prison Camp designation. The government's pleading filed in this matter on April 20, 1987 indicates that Shuck was sentenced in the Southern District of West Virginia by the Honorable Charles H. Haden, II, on January 26, 1987 and was ordered immediately detained. Accordingly, Shuck's self report status was, as a practical matter, modified on that date. Subsequent to Shuck's sentencing in this Court on October 30, 1985, but prior to his sentencing in the Southern District of West Virginia, many events took place which Shuck asserts support his allegation that the Office of the United States Attorney was vindicative in its prosecution of him.

On August 21, 1985, the day on which a guilty verdict was returned in the above-styled criminal action, the government moved, pursuant to Title 18, United States Code, Section 3143(a), for Shuck's detention pending the preparation of a pre-sentence report and the imposition of sentence in this matter. Upon consideration of the record of this criminal action, the Court determined by clear and convincing evidence that Shuck was not likely to flee and did not pose a danger to the safety of any other person or the community and accord-ingly ordered that his bond continue pending the imposition of sentence. As a condition of release the Court ordered Shuck to avoid all contact with those persons, or their respective families, who testified on behalf of the government in this matter.

On September 10, 1985 the government filed its Motion for Revocation of Release based upon a statement taken from Michael Patrick Hogan which indicated that Witness Hogan had, on September 7, 1985, been harassed by Shuck as these two individuals drove along the highways of Marion County, West Virginia. Hogan's affidavit was attached to the government's motion. On October 29, 1985 Shuck filed his response to the government's motion and attached thereto his affidavit and that of his passenger who witnessed the September 7, 1985 incident. These affidavits generally refute the allegation that Witness Hogan was harassed by Shuck on that date.

On October 30, 1985, when Shuck appeared before this Court for sentencing, the Court heard the arguments of counsel with regard to the government's motion for revocation of release. Although the affidavits submitted by Shuck in support of his response to the government's motion indicated that Witness Hogan's vehicle also contained a passenger, the government indicated that it would stand upon the information contained in the affidavit supporting its original motion and offered no further testimony regarding the matter. At the conclusion of sentencing the Court made the following determination:

> The bond under which the defendant [Shuck] is now at large, will remain in force and effect and he will be allowed to voluntarily surrender to a federal institution as will be designated by the Bureau of Prisons and which will be made available in notice to the United States Attorney.

On December 3, 1985, apparently two days before he was to self report to the Federal Prison Camp at Big Springs, Tex-

as [5] to begin serving the sentence imposed by this Court, Shuck filed his Motion For A Stay Of Execution Of Sentence. In its response in opposition filed on December 4, 1985, the government reasserts the September 7, 1985 Shuck–Hogan incident, relates the arrest of Shuck's brother and cousin on witness retaliation charges, asserts that Shuck's mother attempted to have personal contact with jurors during his trial, concludes that Shuck "and his family have no respect for the law and the judicial process," and urges that the Court deny a stay of execution of his sentence. The Court granted Shuck's motion on December 5, 1985, staying the execution of the sentence until January 4, 1986.

On December 30, 1985 Shuck filed his Petition For Release Pending Appeal. Upon consideration of the record in this matter the Court granted Shuck's motion on January 2, 1986, continuing his voluntary reporting date to a future date to be set by the Court, if necessary, upon the conclusion of his appeal. The government's response, which was filed subsequent to the entry of the Court's Order, offered no additional information regarding flight or dangerousness; rather, the government incorporated by reference its December 4, 1985 response to Shuck's motion for a stay of execution.

On April 9, 1986 the government filed its Motion Pursuant to Title 18, United States Code, Section 3143(b) for Revocation of Release. In its motion and supporting materials the government asserts that Shuck has continued to harass Witness Hogan in violation of the Court's order of August 23, 1985. Attached to the government's motion are the statements of Witness Hogan, James K. Higgins, apparently the passenger who was riding in Hogan's vehicle on September 7, 1985,[6] and Neal Jay Hamilton. The government also attached a copy of a West Virginia Complaint For Summons or Warrant sworn by Shuck on March 27, 1986 against Hogan and a Summons to Appear issued by West Virginia Magistrate James P. Feltz, all of which generally describe an event which allegedly occurred on March 27, 1986 between Shuck and Hogan. The complaint was filed by Shuck in the Magistrate's Court of Marion County, West Virginia.

An Assistant Prosecuting Attorney in Marion County, West Virginia testified that Shuck came to her office on June 6, 1986 to talk with her about the referenced state matter and that he gave her copies of grand jury materials, apparently a transcript of Witness Hogan's grand jury testimony regarding Shuck. The witness testified that she, another Assistant Prosecuting Attorney, and the Prosecuting Attorney discussed the matter, contacted the AUSA, and subsequently, on July 7, 1986, dismissed Shuck's complaint on the theory that the complaint was brought as intimidation of a federal witness and lacked merit.

On April 24, 1986 Shuck filed his response to the government's April 9 motion generally denying that he had repeatedly harassed Hogan, as the government had urged, and requesting a hearing on the matter pursuant to 18 U.S.C. § 3148(b).

On Monday June 9, 1986 the judgment of this Court was affirmed by the United States Court of Appeals for the Fourth Circuit. The slip opinion was received and filed in this matter by the Clerk of Court on Thursday June 12, 1986. Also on June 12, 1986 the government filed its Motion For Immediate Detention, suggesting that the likelihood of Shuck's success on appeal was slim in light of the opinion of the Court of Appeals. In response to the government's motion, Shuck indicated that he was seeking redesignation for incarceration at the Federal Prison Camp at Petersburg, Virginia and had contacted the Regional Designator for the Bureau of Prisons, in furtherance of that objective. Shuck requested that he be allowed to self report within thirty (30) days for placement at the

---

**5.** The Court is advised that the Federal Prison Camp at Big Springs, Texas is a Security Level 1 institution.

**6.** In the statement given by Mr. Higgins dated March 28, 1986, he indicates that the incident occurred "[a]pproximately 6 weeks or 2 months ago."

above referenced camp. Inasmuch as the mandate from the Court of Appeals had not been received, the Court declined to address the matters raised and suggested. *See* Rule 41, Federal Rules of Appellate Procedure.

### 2. Representing To The Bureau of Prisons

On June 20, 1986 the AUSA filed the Government's Answer To Defendant's Response wherein he asserts that he, too, had contacted the Bureau of Prisons designator by telephone concerning Shuck's designation to a federal camp facility. In his answer the AUSA asserted that he did not believe that a camp facility would be appropriate for Shuck and indicated that he had made that position known to the Bureau of Prisons. Indeed, in correspondence dated June 20, 1986, the AUSA advised the Bureau of Prisons that the government had filed a motion for revocation of bond on September 10, 1985 because of an alleged altercation between Shuck and Witness Hogan. The AUSA further advised that "[t]he Court did not address the motion at the defendant's sentencing. Later, over the government's objection, the Court granted defendant's release and bond pending appeal." The AUSA also advised the Bureau of Prisons that the Court had taken no action on the government's April 9, 1986 motion for revocation of Shuck's release "despite the fact that Mr. Shuck's brother, cousin and two other individuals had been indicted by a Federal Grand Jury in December, 1985 for going to Mr. Hogan's house and threatening his safety and that of his family because of his testimony against Ralph Shuck." The AUSA also advised that Shuck and other members of his family were subjects of an investigation in the Southern District of West Virginia and that these matters were to be presented to a Grand Jury there in July 1986.

In his reply filed July 10, 1986 Shuck asserts that the AUSA's personal contact with Bureau of Prisons designator was "inappropriate, vindicative behavior on the part of the Government and a violation of the spirit and law of the protection given a defendant under Rule 32 of the Federal Rules of Criminal Procedure."

On January 8, 1987 the AUSA testified that he was required by Section 9–34.220 of the United States Attorney's Manual to file Form 792 with the Chief Executive Officer of the institution to which a defendant would be committed; however, he does not assert that the above-referenced contact with the bureau was in fulfillment of the obligation of the Section.

### 3. Representations To Magistrate Jerry D. Hogg

On July 16, 1986 the Grand Jury sitting in the Southern District of West Virginia returned a three-count indictment against Shuck and others[7] regarding the cultivation of marijuana in the Spring and early Summer of 1981 on a farm in Pocahontas County, West Virginia.[8] On motion of the AUSA a detention hearing was held before the Honorable Jerry D. Hogg, United States Magistrate for the Southern District of West Virginia, on July 31 and August 4, 1986. In support of his allegation that Shuck was a danger to the community and to others the AUSA offered testimony of Michael Patrick Hogan regarding the above-referenced September 1985 and March 1986 Shuck–Hogan incidents. In addition, the AUSA presented testimony regarding the risk involved with Shuck being allowed to remain free on bail, in particular Shuck's behavior at the arraignment of his brother, cousin, and two other individuals jointly charged with witness intimidation in this district. In sum, the additional testimony advanced was that Shuck had referred to the AUSA "as a white rat" and that Shuck had advised the above-named defendants "not to make any statements to the agents or [the AUSA] as the state-

---

**7.** In addition to Ralph E. Shuck, named in the indictment were Steven H. Becker, Shuck's brother-in-law; Frank Becker, Steven's brother; Carl M. Shuck, Shuck's brother; and Linda Shuck, also known as Penny Shuck, Shuck's sister.

**8.** Pocahontas County, West Virginia, was made a part of the Northern Judicial District of West Virginia when the judicial districts in the state were modified on January 14, 1983. Pub.L. No. 97–471, 96 Stat. 2601.

ments would be used against them." In addition, the testimony indicated that Shuck "was somewhat belligerent, using profanity."

On July 31, 1986 the AUSA represented to Magistrate Hogg that this Court "has not made any rulings whatsoever" on his motions to have Shuck detained. Further, the AUSA represented that Shuck "is encouraged by the lack of action by the district court in the Northern District and feels that the Courts will do nothing against him and he may roam free in the Northern District and intimidate Mr. Hogan at his wish." Magistrate Hogg determined that the evidence was insufficient and released Shuck on his own bond.

#### 4. Additional Issues With Regard To Shuck's Release

On September 26, 1986 Shuck filed his Motion To Stay Execution Of Sentence in this Court in order that he could be free to assist in the preparation of his defense on the charges pending in the Southern District of West Virginia. In response the government indicated that a favorable ruling on Shuck's request could result in an inordinate delay in the matter, taking into account appeals and motions pursuant to Rule 35, Federal Rules of Criminal Procedure, and requested that the Court deny Shuck's motion. On October 14, 1986 the Court ordered the execution of Shuck's sentence stayed until further order of the Court.

Although the record in this Court is not clear on the particulars of the matter, apparently during the development of the case against Shuck in the Southern District of West Virginia there came a time when a secured bond in the amount of $75,000 was set. In his successful effort to make this bond it became necessary for Shuck to request that a retired businessman living in Barbour County, West Virginia release a certain deed of trust he held on a certain piece of real estate which he had apparently earlier conveyed to Shuck or perhaps to members of his family. At or about the time the request for the release was made, the AUSA contacted Gerald M. Fogg, an attorney practicing law in Barbour County,

West Virginia who had earlier been associated in practice with the AUSA and who had handled most of the businessman's real estate transactions in Barbour County. According to the testimony of Attorney Fogg, the import of the AUSA's telephone call was to ensure that the businessman "knew that the purpose of that release was to allow the property to be used for security on a criminal bond."

Without addressing the ethical ramifications of the AUSA's attempted use of former professional relationships to adversely affect a present opponent's opportunity to make bail, the Court, nevertheless, recognizes this activity as beyond the bounds of the legitimate adversarial process. This extrajudicial ploy to circumvent the ruling of the Court was yet another facet of the AUSA's ongoing campaign to have Shuck detained in advance of the finality of the pending criminal matter.

Despite the relatively insignificant evidence presented in this Court or in the United States District Court for the Southern District of West Virginia with regard to the asserted danger Shuck posed for others and the community, the AUSA continued efforts to have Shuck detained. Although the AUSA asserts that Shuck was just another criminal matter and presented no additional personal significance to him, Shuck suggests that the record which has been developed in this matter supports the conclusion that he was an individual who, because of his refusal to cooperate with the government in its investigation of criminal matters to which he was apparently a party, became a target of one prosecutor's wrath, notwithstanding the degree of his culpability involving marijuana.

With regard to the AUSA's representation to the Bureau of Prisons and to Magistrate Hogg that this Court had failed to fully consider the government's efforts to have Shuck's bond revoked, the Court record reveals that the government's Motion For Revocation of Release filed on September 10, 1985 following the September 7 Shuck–Hogan incident was decided against the Government. Following Shuck's sentencing on October 30, 1985 his

bond was continued and he was ordered to voluntarily report for incarceration at such a time as a facility was designated for him. The Court record also reveals that Shuck's Motion For a Stay of Execution of Sentence filed on December 3, 1985 and his Petition For Release Pending Appeal filed on December 30, 1985 were also decided against the government.

Shuck's Petition for Release Pending Appeal having been granted on January 2, 1986 and the appeal having been argued on March 4, 1986, the government on April 9, 1986 filed its Motion For Revocation of Release based upon the March 27, 1986 Shuck–Hogan incident. The Court record does not reflect that the Court took any action on this motion while the appeal was pending and this Court's record was before the United States Court of Appeals for the Fourth Circuit. Subsequently, on June 9, 1986, the Court of Appeals affirmed Shuck's conviction in this Court and the government moved for his immediate detention on June 12, 1986. The Court declined to review these matters pending receipt of the mandate of the Court of Appeals and so advised the parties by its order entered June 17, 1986.

It was under this set of circumstances that the AUSA advised the Bureau of Prisons and Magistrate Hogg that this Court had not afforded the government consideration of its September 10, 1985 and April 9, 1986 motions. Despite the AUSA's assertion that he contacted the Bureau of Prisons out of curiosity to learn what information Shuck had supplied the Bureau regarding his designation and that the information contained in the AUSA's June 20, 1986 correspondence was "not only accurate, but complete," it is the view of the Court that the AUSA's letter misrepresented the Court record. Moreover, the Court believes that the AUSA's representations to Magistrate Hogg were likewise inaccurate. In both instances the AUSA portrayed events in a light most favorable to his own agenda. Such callous disregard for accuracy is not viewed with favor in this Circuit. *See e.g., Holcomb v. Colony Bay Coal Company*, 852 F.2d 792 (4th Cir.1988).

## C. *Return of Property, Preindictment Delay, Misplaced Evidence*

In a similar vein Shuck has alleged that the AUSA made misrepresentations in the Southern District of West Virginia regarding disposition of Shuck's property, preindictment delay, and the availability of certain evidence in matters before that Court.

Shuck contends that in support of the government's Motion For Disposition of Property filed in the Southern District of West Virginia, which motion included property seized at the Spruce Flats Farm on July 27, 1981, the AUSA urged that no state court proceedings were then ongoing in the matter. Shuck asserts that this statement, which was contained in a reply dated June 17, 1987, was inaccurate because the Circuit Court of Pocahontas County, West Virginia had issued a June 10, 1987 interlocutory order regarding Shuck's motion for the return of certain property earlier filed in that state court.

Frank Becker was indicted along with Shuck and others in the Southern District of West Virginia. The indictment, which was based upon criminal activity alleged to have occurred in the Spring and Summer of 1981, was returned on July 16, 1986, apparently on the eve of the expiration of the statute of limitations. Becker moved for dismissal on the grounds of preindictment delay. In opposition to Defendant Becker's motion, the AUSA argued that the delay resulted from continued investigation and that several witnesses were not available until 1985 and 1986. Shuck asserts that the AUSA's position is misleading because the witnesses in question had given the government statements and had given grand jury testimony in 1983 and 1984 with only one grand jury appearance being as late as January 24, 1985.

On July 15, 1986 the government presented summary testimony to the Federal Grand Jury in the Southern District of West Virginia generally describing a large scale marijuana farming operation which was discovered by police surveillance helicopter in June of 1981 in Pocahontas County, West Virginia. The summary testimo-

ny was based upon interviews with those persons allegedly involved in the farming operation and upon the review of transcripts of their grand jury testimony. The summary testimony indicated that the farm's initial planting consisted of 5,000 marijuana plants, that during the course of the growing season the male plants were separated to prevent pollination, and that on July 27, 1981 when the farm was raided 1,775 remaining plants were confiscated.

The government presented the testimony of Lester Kodger who, along with his wife, had several years of experience in the cultivation of marijuana and who was, at least, tangentially involved in the Pocahontas County operation. Following their arrest the Kodgers became cooperating witnesses for the government and testified both here and in the Southern District of West Virginia regarding the Pocahontas County operation.

According to his testimony Kodger went to the marijuana farm in July of 1981 to separate the male and female plants but found most of the crop, which he indicated to consist of approximately 500 plants, too immature to be sexed. Kodger's testimony was inconsistent and of little added value here.[9] The government's witness also revealed that he had lied under oath in several particulars, the most remarkable of which is that he testified that he continued to grow marijuana after he was arrested despite his earlier testimony to the contrary.

The marijuana which was seized during the 1981 raid of the Pocahontas County farm was destroyed, with the exception of five plants from each of the two fields which were then analyzed by the State Police laboratory in South Charleston, West Virginia and retained for evidentiary purposes. The retained plants, which were stored in the State Police office at Marlinton, West Virginia, were thought to have been destroyed when floods devastated that area of the state in November of 1985. Sgt. William P. Baker, a member of the West Virginia Department of Public Safety who was stationed at the Marlinton Detachment at the time in question, testified at a hearing in this matter on August 23, 1988. According to Sgt. Baker's testimony, he had advised the government in July of 1986 that the marijuana in question may have been destroyed in the 1985 flood. Sgt. Baker also testified that in September of 1986 when he was moving into a new office, he located the "lost" marijuana samples. Sgt. Baker's testimony is not clear as to when he had advised the government of his discovery; nevertheless, other testimony presented here indicates that the availability of the marijuana samples would have been known at the time of Shuck's December 1986 trial in the Southern District of West Virginia and that the AUSA would have been so advised prior to that trial.

Apparently, it was not until sometime later, perhaps even as late as August 3, 1987, that the whereabouts of the marijuana was made known to counsel for the defendants. Subsequently, at Shuck's request, the marijuana was tested by Eloshly Laboratories, Inc., Oxford, Mississippi on October 19 and 21, 1987 and was determined by that laboratory to be a low-potency variety of marijuana. Shuck argues that had the existence of the marijuana samples been made known to him he could have advanced stronger defenses both here and in the Southern District of West Virginia based upon the low quality which the marijuana was later determined to have been.

The arguments associated with criminal matters in the Southern District of West Virginia have little bearing upon the issues and ultimate disposition of the pending matter except as advanced to demonstrate

---

**9.** Presumably Kodger was called to substantiate the government's position that no *Jencks* material regarding the Kodgers was provided to the defendants because the Kodgers, although they were cooperating witnesses, had never testified before a Grand Jury with regard to these matters. Although the government prepared and presented the Court with a June 13, 1988 statement signed by Kodger indicating that a judge had always been present when he testified, Kodger's testimony reveals that he does not actually know whether a judge was present at those times.

what is suggested to be, at best, a reckless disregard for accuracy and, at worst, outright deception by the AUSA. Moreover, the argument relating to the availability of the marijuana samples has little additional significance for us here: presumably the marijuana was available had Shuck desired to have it tested prior to the August 1985 trial in this matter.

### D. *Harassment of Defense Attorneys*

The atmosphere of abuse of prosecutorial authority urged by Shuck to be prevalent in the Northern District of West Virginia is also demonstrated through the subpoenaed testimony of a representative number of respected defense attorneys. Their many experiences and observations reveal alarming conduct directed at defense counsel by the Office of the United States Attorney in the performance of its investigative and prosecutorial functions.

Jodie M. Boylen, a relatively young and inexperienced attorney admitted to practice in this State in May of 1986 and employed by a more experienced defense attorney practicing in the Eastern Panhandle of West Virginia, testified that on June 18, 1987, following the debriefing of her client by two government agents at the Taylor County, West Virginia, Jail, she was unexpectedly asked to remain in the interrogation room where the two agents, who were then joined by the AUSA, suggested to Ms. Boylen that there had been grand jury testimony that she had been distributing cocaine in the Martinsburg, West Virginia area. Ms. Boylen testified that she indicated that she would like to see a lawyer before further interview; nevertheless, the interrogation continued. The AUSA, who conducted the majority of this interview, then inquired regarding whether her employer was involved in drug related activity.

Ms. Boylen's testimony revealed that the interview was conducted in a small interrogation room with her access to the door partially obstructed by the other individuals. The atmosphere of the interview was perceived by the young attorney to be one of harassment and intimidation, which understandably caused her severe emotional distress. Ms. Boylen further testified that the AUSA advised her that he would bring her before the Grand Jury on obstruction of justice charges if she were to inform her employer of the interrogation. Beyond the personal affront, Ms. Boylen testified that the encounter intimidated her to the point that she believes she would be at a distinct disadvantage in representing criminal defendants in cases in which the AUSA or, indeed, the Office of the United States Attorney for the Northern District of West Virginia would be involved.[10]

The event related to the Court by Ms. Boylen is particularly disturbing since it appears that the meeting was predesigned to coincide with legitimate business of the Narcotics Task Force. Seizing upon the relative inexperience of a young attorney, the AUSA, without prior notice to Ms. Boylen, orchestrated an interrogation which caused her considerable and justifiable distress. To make matters worse, the interrogation continued after Ms. Boylen expressed a desire to consult with an attorney. This furtive arrangement, contrived by the AUSA, is strikingly similar to the chain of events which occurred during Shuck's grand jury testimony.[11] In both instances the AUSA compromised due process and/or other constitutional interests in order to secure desired information or to produce a calculated result.

10. Ms. Boylen testified that she has subsequently ceased practicing criminal law in the Northern District of West Virginia and that the above-described incident was one of the factors which contributed to that decision.

11. The testimony revealed that the AUSA directed the agent in charge to contact him near the end of the debriefing of Ms. Boylen's client so that the AUSA could attend the surprise interview planned for Ms. Boylen. The government's testimony that the AUSA was present as a friend to Ms. Boylen or to otherwise protect her interests is not well taken in light of the ethical considerations raised, notwithstanding Ms. Boylen's testimony that her relationship with the AUSA was a professional one and that neither she nor her family knew him personally.

Jerald Jones and Brent Beveridge, widely recognized in the profession as experienced and able attorneys practicing for twenty-nine years in Clarksburg, West Virginia and fifteen years in Fairmont, West Virginia, respectively, each testified that they had learned that during government debriefings their clients had been asked whether their attorneys had been involved in criminal activity. Mr. Jones concluded that it is difficult to have candid discussions with these and other clients when such an atmosphere of distrust has been wrongfully created.

John Cooper, another highly respected and experienced attorney who has practiced for eighteen years in the Federal and State courts of West Virginia, testified that at or about the time he began prosecuting "the Jividen issue"[12] he learned that a member of the Narcotics Task Force began asking questions in Mr. Cooper's relatively small home community regarding whether there was a link between Mr. Cooper and the distribution of cocaine in Canaan Valley, Tucker County, West Virginia. Mr. Cooper testified that after he had confirmed the matter with the task force member and had inquired of the United States Attorney regarding the incriminatory nature of the matter, he learned from the task force member in question that the task force member had been reprimanded for disclosure of confidential information. Mr. Cooper was careful to point out that he had originally learned of the matter from the community, not through the task force member who was conducting the investigation.[13]

Clark Frame, identified in the profession by colleagues as a distinguished, ethical, and able trial attorney who has practiced for thirty years in Morgantown, West Virginia, testified that the government has inquired of his clients regarding whether Mr. Frame was involved in criminal activity.[14]

Mr. Frame also indicated that on one occasion his housekeeper was detained and questioned regarding Mr. Frame's conduct in private and public life. Mr. Frame also testified that another client had recently related to him that when the client had indicated to Narcotics Task Force investigators that he planned to retain Mr. Frame as his attorney, they advised the client that Mr. Frame "obstructs things" and "does not cooperate." Mr. Frame also testified that a client had revealed to him that Sergeant Leonard E. Lanham, a member of the West Virginia Department of Public Safety and also a member of the Narcotics Task Force in this district, had asked the client on numerous occasions whether he knew anything "embarrassing" about the undersigned United States District Judge. The client, a Deputy Sheriff in Randolph County, West Virginia, and also the Sheriff

---

**12.** *See United States v. Schell,* 775 F.2d 559 (4th Cir.1985).

**13.** The officer testified that he was named to the Narcotics Task Force in January of 1985 after he had briefed the AUSA regarding his Canaan Valley drug investigation. Although he had not received any information regarding Mr. Cooper prior to that time, he, along with another task force member, subsequently inquired in the community whether Mr. Cooper was involved in any way with cocaine matters. The officer testified that he was later instructed by the AUSA not to use names in the community but to "ask the witness if they knew any professional people such as policemen, lawyers, doctors, people like that if they were involved in any way." He also testified that the United States Attorney instructed the officer to notify him personally if any further information was developed regarding Mr. Cooper. Finally, the officer testified that he left the task force when he was transferred back into uniform to train new troopers in July of 1985.

**14.** James R. Brown, an individual who had earlier been convicted in criminal matters here and in other jurisdictions, testified that Narcotics Task Force members had come to his home one evening during the pendency of these matters and had indicated that they sought incriminating information about Mr. Frame and other prominent Morgantown, West Virginia attorneys. Brown also testified that the investigators urged that Brown knew of an alleged delivery of $40,000.00 from Mr. Frame to the undersigned United States District Judge and suggested that his (Brown's) cooperation could generate a government agreement benefiting him and/or his girl friend who were otherwise facing long prison terms. Brown's testimony revealed that the Narcotics Task Force members had invited Brown to fabricate knowledge in return for the government's largess.

of Randolph County testified that on several occasions Sgt. Lanham had indicated to them that he sought "embarrassing" information about the undersigned and certain named prominent attorneys practicing in Elkins, West Virginia.[15]

Franklin Cleckley, a nationally recognized and respected Professor of Law teaching at the West Virginia University College of Law for eighteen years and a member of the National Advisory Council for the National Association for the Advancement of Colored People, testified that he had counseled with many attorneys practicing in this district who were concerned about the propriety of investigative and prosecutorial practices in this district. Professor Cleckley concluded that "except for a few, the good, criminal defense attorney is not trying cases in the Northern District of West Virginia now; and I say it has a lot to do with that."

Professor Cleckley testified that his practice of law in the Northern District of West Virginia and elsewhere has not escaped the impact that the government's reckless disregard for the truth has had on defense work in the district. Professor Cleckley's testimony revealed specific instances where the government's attorneys presented grand and petit jury testimony known by them to be inaccurate and allowed the inaccuracy to remain uncorrected. In addition, Professor Cleckley testified that he believed that people investigating drug cases in the Northern District of West Virginia had started rumors that Professor Cleckley was a federal agent, which he indicated has had an adverse impact upon his practice here and on a national level. Further, Professor Cleckley testified that on one occasion when he was assisting one of the above-named West Virginia attorneys with a criminal matter, the atmosphere created by the government's inquiry of the client undermined the other attorney's effective-

ness because "he was very concerned about being investigated by the United States Attorney's office."

John L. Marks, Jr., known as another able and respected attorney, who has practiced for eleven years in Clarksburg, West Virginia, testified that following a client's entry of a plea agreement with the government the client was asked during a government debriefing whether he had cocaine dealings with Mr. Marks or whether he had "ever partied with him where cocaine was used." Further, Mr. Marks indicated, regarding another named attorney practicing with Mr. Marks' firm, that the client had been asked whether he knew of the other attorney's involvement with the cultivation of marijuana. The specific question asked was "Have you ever been out to his farm where there was marijuana growing?"

Summarized generally, the testimony of the attorney-witnesses as presented in this matter reveals that criminal defendants in the Northern District of West Virginia have been interrogated in a manner and style which insinuates that the defendant's attorney is involved in criminal activity or that the attorney maintains certain relationships which conflict with the attorney's full and fair representation of the defendant. Targets of grand jury investigation have been subpoenaed to the Grand Jury where they were asked questions by government attorneys which implied, at least, the possible criminal involvement of named attorneys who represent criminal defendants before the Court. Further, individuals in certain attorneys' home communities have been questioned in a manner which generates the erroneous conclusion in the community that the attorney is the subject or a target of a criminal investigation. In addition, individuals charged with or suspected of serious criminal activity have been approached, in many instances

---

**15.** The testimony having revealed the government's unsuccessful design to implicate the undersigned and others in illegal, embarrassing, or scandalous conduct, the Court advised the parties on June 21, 1988, in open court that the ethical issues raised by this particular government activity is a proper subject for consideration by an appropriate forum, such as the West Virginia State Bar Ethics Committee, pursuant to Local Court Rule 1.05(a) and the Rules of Attorney Disciplinary Enforcement, promulgated in this district on May 10, 1985 and now printed as Local Rule 1.05(b), and/or the Public Integrity Section of the United States Department of Justice and/or the appropriate Committees of the United States Congress.

without the prior consent from retained or appointed counsel, and interviewed in a manner which suggests that the individual's statement implicating judges, lawyers, public officials, or other prominent persons in embarrassing or illegal conduct would, in turn, result in more favorable treatment or less severe exposure for the individual.

The testimony of these able and respected defense attorneys reveals a patterned abuse of the investigative and prosecutorial functions of the Office of the United States Attorney in the Northern District of West Virginia. The subtle insinuations that innumerable members of the defense bar are involved in potential criminal activity manufactures baseless allegations of wrongdoing. Specifically, it creates an atmosphere of client distrust and generally it wrongfully destroys the confidence of the community in the attorney's integrity and competence. In sum, the practice destroys the very foundation of the attorney-client relationship.

The totality of the evidence presented in this matter supports the conclusion that a climate of oppression, harassment, and intimidation has permeated the adversarial process in criminal matters in this district and is resulting in the subversion of the traditional representation of criminal defendants.

### III.

28 U.S.C. § 2255 provides, in pertinent part, as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

It is not contended here that Shuck's sentence was imposed in excess of the maximum which is authorized by law or that the Court was without jurisdiction to entertain this criminal matter. Rather Shuck argues, in essence, that a substantial abuse of investigative and prosecutorial authority is prevalent in the Northern District of West Virginia, that he has been the victim of such practice, and, in particular, that the right to be free from being compelled in a criminal case to be a witness against oneself, guaranteed him by the Fifth Amendment to the Constitution of the United States, was denied or infringed to a degree which subjects his subsequent conviction to collateral attack in these proceedings. If the Court finds that this is so, 28 U.S.C. § 2255 provides that the Court

shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

The issues raised and suggested by the development of the record in this criminal matter cause the Court grave concern. They are troubling to the Court because of the high level of public trust which must be vested in the Office of the United States Attorney. The rule of law requires that our learned profession maintain the highest standards of integrity, being especially cautious in the exercise of its office when the constitutional rights of the accused are obviously at peril. The noble incentive of "doing justice" must never be employed to produce ignoble gain. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). It is highly regrettable where, as here, the prosecution of a particular case of convicted wrongdoing is dramatically upstaged by the subversion of the adversarial process which has been illuminated by the totality of the evidence presented in this matter.

Focusing directly upon the events which eventually led to his conviction in this Court, Shuck argues that the AUSA intentionally tricked him during grand jury questioning into believing that he "did not have the right to refuse to answer questions that could incriminate someone else even though those responses might tend to incriminate himself." The government, relying upon *United States v. Mandujano*,

425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1975), blandly counters that the Fifth Amendment privilege cannot be construed to include the right to commit perjury. Inasmuch as the privilege must be accorded liberal construction in favor of the right it was intended to secure, *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951), and inasmuch as

> [t]he privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime,

*Id.*, a close examination of *Mandujano* and its progeny is necessary to determine whether those cases foreclose Shuck's argument as presented in this matter.

In *Mandujano*, the Supreme Court considered whether warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), must be given to a grand jury witness and whether, absent such warnings, false statements made to the Grand Jury must be suppressed in a subsequent prosecution for perjury based upon those statements.[16] The eight participating Justices agreed that the perjured testimony was admissible, but filed three separate opinions expressing varying reasons.

Chief Justice Burger wrote the opinion for a plurality of the Court, concluding that *Miranda* warnings need not be given to a grand jury witness, even if the witness is a target of the investigation. In declining to expand *Miranda* to the grand jury setting, Chief Justice Burger explained that the atmosphere for coerced confession seen by the *Miranda* court as endemic to custodial police interrogation has been recognized by the Court to be wholly different than that of the Grand Jury inquiring into criminal activity under the guidance of the Court.

Further, the Court observed that the warnings volunteered by the prosecutor were more than sufficient to inform the witness of his rights and his responsibilities before the Grand Jury. The Court also indicated that giving a grand jury witness the full panoply of *Miranda* would be incorrect:

> Under *Miranda*, a person in police custody has, of course, an absolute right to decline to answer any question, incriminating or innocuous, whereas a grand jury witness, on the contrary, has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim. And even when the grand jury witness asserts the privilege, questioning need not cease, except as to the particular subject to which the privilege has been addressed. Other lines of inquiry may properly be pursued. (Citations omitted).

*Mandujano* at 580–81, 96 S.Ct. at 1778.

The Court concluded that the grand jury witness

> was free at every stage to interpose his constitutional privilege against self-incrimination, but perjury was not a per-

---

16. The witness had been advised of his Fifth Amendment privilege by the prosecutor in the following fashion:

"Q. ...Now, you are required to answer all the questions that I ask you except for the ones that you feel would tend to incriminate you. Do you understand that?
"A. Do I answer all the questions you ask?
"Q. You have to answer all the questions except for those you think will incriminate you in the commission of a crime. Is that clear?
"A. Yes, sir.
"Q. You don't have to answer questions which would incriminate you. All other questions you have to answer openly and truthfully. And, of course, if you do not answer those [questions] truthfully, in other words if you do not answer those [questions] truthfully, in other words if you lie about certain questions, you could possibly be charged with perjury. Do you understand that?
"A. Yes, sir.
....
"Q. Have you contacted a lawyer in this matter?
"A. I don't have one. I don't have the money to get one.
"Q. Well, if you would like to have a lawyer, he cannot be inside this room. He can only be outside. You would be free to consult with him if you so chose. Now, if during the course of this investigation, the questions that we ask you, if you feel like you would like to have a lawyer outside to talk to, let me know."
*Mandujano* 425 U.S. at 567–68, 96 S.Ct. at 1772.

missible option. As the Tenth Circuit has held, the law provides "other methods for challenging the government's right to ask questions." *United States v. Pommerening*, 500 F.2d 92, 100 ( [10th Cir.] 1974).

*Mandujano* 425 U.S. at 584, 96 S.Ct. at 1780.

Indeed, *Mandujano* is instructive with regard to inquiry of grand jury witnesses:

Absent a claim of the privilege, the duty to give testimony remains absolute.

The stage is therefore set when the question is asked. If the witness interposes his privilege, the grand jury has two choices. If the desired testimony is of marginal value, the grand jury can pursue other avenues of inquiry; if the testimony is thought sufficiently important, the grand jury can seek a judicial determination as to the bona fides of the witness' Fifth Amendment claim, *Malloy v. Hogan*, 378 U.S. 1, 11–12 [84 S.Ct. 1489, 1495, 12 L.Ed.2d 653] (1964); *Hoffman v. United States*, 341 U.S. 479, 486–487 [71 S.Ct. 814, 818, 95 L.Ed. 1118] (1951), in which case the witness must satisfy the presiding judge that the claim of privilege is not a subterfuge. If in fact " 'there is reasonable ground to apprehend danger to the witness from his being compelled to answer,' " *Brown v. Walker*, [161 U.S. 591 (1896) ] at 599, [16 S.Ct. 644, 648, 40 L.Ed. 819, 822] the prosecutor must then determine whether the answer is of such overriding importance as to justify a grant of immunity to the witness.

If immunity is sought by the prosecutor and granted by the presiding judge, the witness can then be compelled to answer, on pain of contempt, even though the testimony would implicate the witness in criminal activity. The reason for this is not hard to divine; Mr. Justice Frankfurter indicated as much in observ-

ing that immunity is the *quid pro quo* for securing an answer from the witness: "Immunity displaces the danger." *Ullmann v. United States*, 350 U.S. 422, 439 [76 S.Ct. 497, 507, 100 L.Ed. 511] (1956); see also *Piemonte v. United States*, 367 U.S. 556, 560 [81 S.Ct. 1720, 1722, 6 L.Ed.2d 1028] (1961).

*Mandujano* 425 U.S. at 575, 96 S.Ct. at 1776.

Justice Brennan and Justice Marshall concurred with the plurality opinion but distinguished the situation from that in which a witness' false answers were induced by prosecutorial tactics which constituted a violation of due process. Likewise, Justice Stewart and Justice Blackmun concurred with the plurality recognizing that "this is not a case where it could plausibly be argued that the perjury prosecution must be barred because of prosecutorial conduct amounting to a denial of due process...." *Mandujano*, at 609, 96 S.Ct. at 1792.

The Supreme Court examined an even narrower question in *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed. 2d 231 (1977). In that case, the Court was called upon to decide whether a grand jury witness, who was a target of grand jury investigation and who was later indicted for perjury committed before the Grand Jury, is entitled to suppression of the false testimony on the ground that the witness was not effectively advised of the Fifth Amendment privilege.[17] Upon review of the matter the Supreme Court, following *Mandujano*, held that the Fifth Amendment testimonial privilege does not protect perjury. In *Wong* the Court also addressed the due process considerations raised by the concurring opinions in *Mandujano;* however, the Court concluded that the perceived [18] unfairness simply does not justify perjury because lying is not one of

**17.** Although the witness was advised of the privilege, it was later determined, because of the witness' limited understanding of the English language, that the warning had no legal effect.

**18.** As the Court put it

...to characterize these proceedings as "unfair" by virtue of inadequate Fifth Amendment warnings is essentially to say that the Government acted unfairly or oppressively by asking searching questions of a witness uninformed of the privilege.
*Wong* 431 U.S. at 180, 97 S.Ct. at 1827.

the acceptable methods for challenging the government's right to ask questions.

In *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), the Court addressed the question of whether a grand jury witness must be informed in advance of his testimony that he is a potential defendant in danger of indictment. The Court held that the comprehensive warnings given to the witness prior to his testimony,[19] whether or not such warnings were constitutionally required, dissipated any element of compelled self-incrimination that might otherwise have been present. More significantly, however, the Court ruled that the fact that a subpoenaed grand jury witness is a putative or potential defendant neither impairs nor enlarges his constitutional right.

In view of these cases it is now possible that a witness, even a putative defendant-witness, may be interviewed in a grand jury setting without first being advised in *Miranda* fashion. In the above-referenced cases the witness before the respective Grand Juries did not express the desire to invoke the protection of the Fifth Amendment and, absent the assertion of privilege against giving testimony, the duty to give testimony remains absolute. Moreover, a witness who fails to assert his Fifth Amendment privilege and then perjures himself before the Grand Jury may not, absent some viable due process claim, be later heard to complain of violation of his Fifth Amendment privilege.

The facts under consideration here are distinguished in a number of ways from *Mandujano* and its progeny. In those cases none of the witnesses expressed a desire to invoke their Fifth Amendment privilege. Shuck repeatedly asserted the privilege. Moreover, the AUSA knew in advance that Shuck would raise the privilege and had indicated to Shuck's attorney that he preferred that Shuck appear and assert the privilege he claimed before the Grand Jury itself. In addition, although

Shuck was advised as to the Fifth Amendment privilege at the outset of his grand jury appearance, the warning given Shuck was novel in one very important respect. For example, in *Wong* the tenor of the advice given the witness is expressed in the following excerpt:

> You ... need not answer *any question* which you feel may ... incriminate you.... [Y]ou [have] the right to refuse to answer *any question* which you feel might incriminate you.... (Emphasis supplied).

*Wong*, 431 U.S. at 175, n. 2, 97 S.Ct. at 1824, n. 2 (1977). In the instant case, when the AUSA initially advised Shuck of his Fifth Amendment privilege, he specifically qualified that advice with the following language:

> You do not have the right to refuse to answer questions that would incriminate someone else, and if you have knowledge of a violation, you do not have the right to invoke your Fifth Amendment privilege to protect another individual.

As is set forth *ante*, at the point where the AUSA focused his questions upon Shuck's involvement in the cultivation, preparation, or distribution of controlled substances, Shuck asserted the Fifth Amendment privilege. Following three similar exchanges and having verbally confirmed that Shuck intended to continue to rely upon the Fifth Amendment, the AUSA asked whether Shuck was "aware of any type of marijuana farming operation." Shuck again declined to answer and the AUSA warned Shuck that he could not rely upon the Fifth Amendment privilege to protect others. Nevertheless, Shuck advised that he would continue to rely upon the asserted privilege.

In the face of the often asserted privilege the AUSA continued to grill Shuck regarding his involvement with controlled substances and Shuck continued to decline to answer. When the AUSA asked wheth-

---

**19.** The witness was informed of the warnings prescribed by *Miranda* orally and in writing. In addition, the witness signed a waiver acknowledging that he waived the privilege against compelled self-incrimination. The witness then testified without asserting the privilege.

er Shuck's brother-in-law, Steven Becker,[20] was employed and Shuck had again asserted the Fifth Amendment, the AUSA scolded the witness:

> I told you, Mr. Shuck, you have the right to protect yourself, but not your brother in law.

Following this Shuck conferred with his attorney and then returned to the grand jury room and gave further testimony, including testimony denying that he had any knowledge of the involvement of Steven Becker, Frank Becker, Linda Shuck, Mike Shuck, and others in the cultivation, preparation, or distribution of marijuana. It was this testimony that was determined by a subsequent Grand Jury and also by a Petit Jury to constitute perjury.

## IV.

Upon full consideration of the totality of evidence presented with regard to Shuck's grand jury testimony, given the circumstances known to the AUSA at the time of the initial grand jury proceeding, the Court believes that the AUSA was predisposed to confuse the nature and extent of the witness' Fifth Amendment right not to incriminate himself and that Shuck's declarations before the Grand Jury were enticed in violation of rights guaranteed him by the Fifth Amendment.

The government argues that the Fifth Amendment must not be construed to include a right to commit perjury and that Shuck had no right to misrepresent the truth whether or not he fully understood the Fifth Amendment right against self-incrimination. Further, the government asserts that Shuck's argument must fail because the government has not offered Shuck's grand jury testimony as "incriminating statements." While the Court recognizes that the commission of perjury is not an acceptable method of challenging the government's right to ask questions and while the Court certainly does not condone perjury, the fundamental fairness issues inherent in Shuck's argument must not be overlooked.

Prosecutors often call persons suspected of criminal activity before the Grand Jury to testify concerning that activity. The availability of this tactic has tempted some into abuse. *See Mandujano,* 425 U.S. at 594–95, 96 S.Ct. at 1785–86 (Brennan, J., concurring). Such tactical gamesmanship must not be tolerated under facts such as those presented here: it may well result in the abuse of the grand jury process and in the deprivation of individual due process.

As is reflected in the advice given Shuck at the outset of his grand jury appearance, the AUSA was independently aware of the potentially incriminatory nature of the questions he had prepared. In addition, the AUSA was advised by Shuck's attorney that Shuck intended to rely upon the protection of the Fifth Amendment. Moreover, when Shuck appeared before the Grand Jury he asserted the privilege.

While the government may require a witness to appear before the Grand Jury, be sworn, and formalize the avowed intent to rely upon the protection of the Fifth Amendment, the government may not continue to press the witness in areas to which the privilege is asserted. *See Bank of Nova Scotia v. United States,* —— U.S. ——, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Here, the AUSA advised Shuck, in essence, that his assertion of the Fifth Amendment privilege to the questions posed before the Grand Jury was "improper" or worse "not permitted." Obviously, such "advice" is an end run around the privilege asserted: the nature and scope of the witness' Fifth Amendment protection is a question for determination by the Court, *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1950), where the witness' assertion will be afforded full representation of counsel. Absent this procedural protection both the witness' constitutional rights and the grand jury's traditional functions [21] are unnecessarily vulnerable.

In light of the nonadversarial nature of grand jury proceedings, the government should take the initiative to ensure that a witness' constitutional rights are fully pro-

---

**20.** *See* footnote 7 and accompanying text.

**21.** The grand jury has two principal functions. First, it bears the weighty responsibility of

investigating crime and determining whether there is probable cause to believe that a crime has been committed. *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38

tected, erring, if need be, on the side of caution. A prosecutor must remember that he "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all...." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The government simply may not impose upon the witness its opinion as to the nature and scope of the privilege asserted or otherwise lure the witness into compromising his asserted claim of privilege. *See United States v. Pepe*, 367 F.Supp. 1365 (D.Conn.1973).

It is no salve to say that the witness was able to seek the advice of counsel through the grand jury door. The Court does not believe that the witness, with compelled self-incrimination at stake, must be required to carry the full import of the grand jury inquiry and the privilege asserted to the corridor conference. Rather, the Court believes that the asserted Fifth Amendment privilege is more appropriately defined and more adequately protected through full presentation to the Court. *See e.g., United States v. Helstoski*, 442 U.S. 477, 482, 99 S.Ct. 2432, 2436, 61 L.Ed. 2d 12 (1978). The Court will not allow the framework of this important procedural safeguard to be sabatoged.

Perjured testimony before a Grand Jury is tainted by prosecutorial misconduct if the misconduct undermines the validity of the grand jury process itself. *United States v. Babb*, 807 F.2d 272 (1st Cir.1986). Worse yet is the situation where, as here, the perjured testimony was inveigled by the inappropriate and assumed interpretations of law made by the AUSA. When viewed in the context of this matter, the AUSA's insistence that Shuck could not rely upon the protection of the Fifth Amendment in response to the questions posed was a condemnable course of conduct, designed for the purpose of compelling self-incrimination or laying the founda-

tion for the subsequent presentation of a perjury indictment to the Grand Jury. If the AUSA truly desired to have Shuck testify with regard to a close-knit criminal activity of himself and other individuals without incriminating himself, the provisions of 18 U.S.C. § 6001 *et seq.* were available to him.

In the final analysis the Court believes that the fairness of the grand jury process was so fundamentally affected by the conduct of the AUSA that the subsequent conviction cannot be allowed to stand. Taken as a whole the conduct of the AUSA in connection with Shuck's grand jury appearance undermined the validity *vel non* of the asserted Fifth Amendment privilege and, because the asserted privilege was not presented to the Court in order that its parameters could properly be defined, the AUSA substantially undermined the traditional functions of the Grand Jury.

Accordingly, the judgment of conviction in this matter is vacated and set aside and the Defendant is discharged.

---

L.Ed.2d 561 (1974). The second and no less important, task of the grand jury is to "serv[e] the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or dictat-

ed by an intimidating power or by malice and personal ill will." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962).

*United States v. Mechanik*, 475 U.S. 66, 73–74, 106 S.Ct. 938, 943–944, 89 L.Ed.2d 50 (1985) (O'Connor, J., concurring).