431 U.S. 181 (1977)
UNITED STATES
v.
WASHINGTON.
No. 74-1106.
Supreme Court of United States.
Argued December 6, 1976.
Decided May 23, 1977.
CERTIORARI TO THE DISTRICT OF COLUMBIA COURT OF APPEALS.
William F. Sheehan III argued the cause for the United States. With him on the brief were Solicitor General Bork, *182 Assistant Attorney General Thornburgh, Deputy Solicitor General Frey, and Sidney M. Glazer.
Frederick H. Weisberg argued the cause for respondent. With him on the brief were Robert M. Weinberg and Mervin N. Cherrin.
MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.
The question presented in this case is whether testimony given by a grand jury witness suspected of wrongdoing may be used against him in a later prosecution for a substantive criminal offense when the witness was not informed in advance of his testimony that he was a potential defendant in danger of indictment.[1]

(1)
The facts are not in dispute. Zimmerman and Woodard were driving respondent's van truck when a Washington, D. C., policeman stopped them for a traffic offense. Seeing a motorcycle in the rear of the van which he identified as stolen, the officer arrested both men and impounded respondent's vehicle. When respondent came to reclaim the van, he told police that Zimmerman and Woodard were friends who were driving the van with his permission.
He explained the presence of the stolen motorcycle by saying that while driving the van himself he had stopped to assist an unknown motorcyclist whose machine had broken down. Respondent then allowed the motorcycle to be placed in his van to take it for repairs. Soon after this the van stalled and he walked to a nearby gasoline station to call Zimmerman and Woodard for help, leaving the van with the unknown *183 motorcyclist. After reaching Zimmerman by phone, respondent waited at the gasoline station for his friends, then returned to the spot he had left the van when they failed to appear; by that time the van had disappeared. Respondent said he was not alarmed, assuming his friends had repaired the van and driven it away. Shortly thereafter, Zimmerman and Woodard were arrested with the stolen motorcycle in the van.
Not surprisingly, the officer to whom respondent related this tale was more than a little skeptical; he told respondent he did not believe his story, and advised him not to repeat it in court, "because you're liable to be in trouble if you [do so]." The officer also declined to release the van. Respondent then repeated this story to an Assistant United States Attorney working on the case. The prosecutor, too, was dubious of the account; nevertheless, he released the van to respondent. At the same time, he served respondent with a subpoena to appear before the grand jury investigating the motorcycle theft.
When respondent appeared before the grand jury, the Assistant United States Attorney in charge had not yet decided whether to seek an indictment against him. The prosecutor was aware of respondent's explanation, and was also aware of the possibility that respondent could be indicted by the grand jury for the theft if his story was not believed.
The prosecutor did not advise respondent before his appearance that he might be indicted on a criminal charge in connection with the stolen motorcycle. But respondent, after reciting the usual oath to tell the truth, was given a series of other warnings, as follows:
"Q . . . .
"You have a right to remain silent. You are not required to say anything to us in this Grand Jury at any time or to answer any question.[2]

*184 "Anything you say can be used against you in Court.
"You have the right to talk to a lawyer for advice before we question you and have him outside the Grand Jury during any questioning.
"If you cannot afford a lawyer and want one a lawyer will be provided for you.
"If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time.
"You also have the right to stop answering at any time until you talk to a lawyer.
"Now, do you understand those rights, sir?
"A Yes, I do.
"Q And do you want to answer questions of the Grand Jury in reference to a stolen motorcycle that was found in your truck?
"A Yes, sir.
"Q And do you want a lawyer here or outside the Grand Jury room while you answer those questions?
"A No, I don't think so."
In response to questions, respondent again related his version of how the stolen motorcycle came to be in the rear of his van. Subsequently, the grand jury indicted respondent, Zimmerman, and Woodard for grand larceny and receiving stolen property.
Respondent moved to suppress his testimony and quash the indictment, arguing that it was based on evidence obtained in violation of his Fifth Amendment privilege against compelled self-incrimination. The Superior Court for the District of *185 Columbia suppressed the testimony and dismissed the indictment, holding that before the Government could use respondent's grand jury testimony at trial, it had first to demonstrate that respondent had knowingly waived his privilege against compelled self-incrimination. Notwithstanding the comprehensive warnings described earlier, the court found no effective waiver had been made, holding that respondent was not properly advised of his Fifth Amendment rights. The court thought the Constitution required, at a minimum, that
"inquiry be made of the suspect to determine what his educational background is, and what his formal education is and whether or not he understands that this is a constitutional privilege and whether he fully understands the consequences of what might result in the event that he does waive his constitutional right and in the event that he does make incriminatory statements . . . ."
The court also held that respondent should have been told that his testimony could lead to his indictment by the grand jury before which he was testifying, and could then be used to convict him in a criminal prosecution.
The District of Columbia Court of Appeals affirmed the suppression order. 328 A. 2d 98 (1974).[3] That court also took the position that "the most significant failing of the prosecutor was in not advising [respondent] that he was a potential defendant. Another shortcoming was in the prosecutor's waiting until after administering the oath in the cloister *186 of the grand jury before undertaking to furnish what advice was given." Id., at 100.[4]

(2)
The implicit premise of the District of Columbia Court of Appeals' holding is that a grand jury inquiry, like police custodial interrogation, is an "interrogation of persons suspected or accused of crime [that] contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda v. Arizona, 384 U. S. 436, 467 (1966). But this Court has not decided that the grand jury setting presents coercive elements which compel witnesses to incriminate themselves. Nor have we decided whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses; moreover, we have no occasion to decide these matters today, for even assuming that the grand jury setting exerts some pressures on witnesses generally or on those who may later be indicted, the comprehensive warnings respondent received in this case plainly satisfied any possible claim to warnings. Accordingly, respondent's grand jury testimony may properly be used against him in a subsequent trial for theft of the motorcycle.
Although it is well settled that the Fifth Amendment privilege extends to grand jury proceedings, Counselman v. Hitchcock, 142 U. S. 547 (1892), it is also axiomatic that the Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials. "It does not preclude *187 a witness from testifying voluntarily in matters which may incriminate him," United States v. Monia, 317 U. S. 424, 427 (1943), for "those competent and freewilled to do so may give evidence against the whole world, themselves included." United States v. Kimball, 117 F. 156, 163 (CC SDNY 1902); accord, Miranda, supra, at 478; Michigan v. Tucker, 417 U. S. 433 (1974); Hoffa v. United States, 385 U. S. 293 (1966). Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. In addition to guaranteeing the right to remain silent unless immunity is granted, the Fifth Amendment proscribes only self-incrimination obtained by a "genuine compulsion of testimony." Michigan v. Tucker, supra, at 440. Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions. Accordingly, unless the record reveals some compulsion, respondent's incriminating testimony cannot conflict with any constitutional guarantees of the privilege.[5]
The Constitution does not prohibit every element which influences a criminal suspect to make incriminating admissions. See Garner v. United States, 424 U. S. 648 (1976), Beckwith v. United States, 425 U. S. 341 (1976); Schneckloth v. Bustamonte, 412 U. S. 218, 223-227 (1973). Of course, for many witnesses the grand jury room engenders an atmosphere conducive to truthtelling, for it is likely that upon being brought *188 before such a body of neighbors and fellow citizens, and having been placed under a solemn oath to tell the truth, many witnesses will feel obliged to do just that. But it does not offend the guarantees of the Fifth Amendment if in that setting a witness is more likely to tell the truth than in less solemn surroundings. The constitutional guarantee is only that the witness be not compelled to give self-incriminating testimony. The test is whether, considering the totality of the circumstances, the free will of the witness was overborne. Rogers v. Richmond, 365 U. S. 534, 544 (1961).

(3)
After being sworn, respondent was explicitly advised that he had a right to remain silent and that any statements he did make could be used to convict him of crime. It is inconceivable that such a warning would fail to alert him to his right to refuse to answer any question which might incriminate him. This advice also eliminated any possible compulsion to self-incrimination which might otherwise exist. To suggest otherwise is to ignore the record and reality. Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled. Moreover, any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with incriminatory aspects is completely removed by the warnings given here. Even in the presumed psychologically coercive atmosphere of police custodial interrogation, Miranda does not require that any additional warnings be given simply because the suspect is a potential defendant; indeed, such suspects are potential defendants more often than not. United States v. Binder, 453 F. 2d 805, 810 (CA2 1971), cert. denied, 407 U. S. 920 (1972).
Respondent points out that unlike one subject to custodial interrogation, whose arrest should inform him only too clearly that he is a potential criminal defendant, a grand jury witness *189 may well be unaware that he is targeted for possible prosecution. While this may be so in some situations, it is an overdrawn generalization. In any case, events here clearly put respondent on notice that he was a suspect in the motorcycle theft. He knew that the grand jury was investigating that theft and that his involvement was known to the authorities. Respondent was made abundantly aware that his exculpatory version of events had been disbelieved by the police officer, and that his friends, whose innocence his own story supported, were to be prosecuted for the theft. The interview with the prosecutor put him on additional notice that his implausible story was not accepted as true. The warnings he received in the grand jury room served further to alert him to his own potential criminal liability. In sum, by the time he testified respondent knew better than anyone else of his potential defendant status.
However, all of this is largely irrelevant, since we do not understand what constitutional disadvantage a failure to give potential defendant warnings could possibly inflict on a grand jury witness, whether or not he has received other warnings. It is firmly settled that the prospect of being indicted does not entitle a witness to commit perjury, and witnesses who are not grand jury targets are protected from compulsory self-incrimination to the same extent as those who are. Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to protection of Fifth Amendment rights.
Respondent suggests he must prevail under Garner v. United States, supra. There, the petitioner was charged with a gambling conspiracy. As part of its case, the Government introduced Garner's income tax returns, in one of which he had identified his occupation as "professional gambler," and in all of which he had reported substantial income from wagering. The Court recognized that Garner was indeed compelled by law to file a tax return, but held that this did not *190 constitute compelled self-incrimination. The Court noted that Garner did not claim his Fifth Amendment privilege, instead making the incriminating disclosure that he was a professional gambler. Garner holds that the Self-Incrimination Clause is violated only when the Government compels disclosures which it knows will incriminate the declarant that is, only when it intentionally places the individual under "compulsions to incriminate, not merely compulsions to make unprivileged disclosures." 424 U. S., at 657. But the distinction between compulsion to incriminate and compulsion to disclose what the Government is entitled to know is of no help to respondent; in this case there was no compulsion to do either.
In Beckwith v. United States, decided shortly after Garner, we reaffirmed the need for showing overbearing compulsion as a prerequisite to a Fifth Amendment violation. There, the Government agent interrogated the taxpayer for the explicit purpose of securing information that would incriminate him. There, as here, the interrogation was not conducted in an inherently coercive setting; hence the claim of compelled self-incrimination was rejected.[6]

(4)
Since warnings were given, we are not called upon to decide whether such warnings were constitutionally required. However, *191 the District of Columbia Court of Appeals held that whatever warnings are required are insufficient if given "in the cloister of the grand jury." 328 A. 2d, at 100. That court gave no reason for its view that warnings must be given outside the presence of the jury, but respondent now advances two justifications. First, it could be thought that warnings given to respondent before the grand jury came too late, because of the short time to assimilate their significance, and because of the presence of the grand jurors. But respondent does not contend that he did not understand the warnings given here. In any event, it is purely speculative to attribute any such effects to warnings given in the presence of the jury immediately before taking the stand. If anything, the proximity of the warnings to respondent's testimony and the solemnity of the grand jury setting seem likely to increase their effectiveness.
Second, respondent argues that giving the oath in the presence of the grand jury undermines assertion of the Fifth Amendment privilege by placing the witness in fear that the grand jury will infer guilt from invocation of the privilege. But this argument entirely overlooks that the grand jury's historic role is as an investigative body; it is not the final arbiter of guilt or innocence. Moreover, it is well settled that invocation of the Fifth Amendment privilege in a grand jury proceeding is not admissible in a criminal trial, where guilt or innocence is actually at stake.
The judgment of the Court of Appeals is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.
Reversed and remanded.
MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.
The general rule that a witness must affirmatively claim the privilege against compulsory self-incrimination must in my *192 view admit of an exception in the case of a grand jury witness whom the prosecutor interrogates with the express purpose of getting evidence upon which to base a criminal charge against him. In such circumstances, even warnings, before interrogation, of his right to silence do not suffice. The privilege is emptied of substance unless the witness is further advised by the prosecutor that he is a potential defendant. Only if the witness then nevertheless intentionally and intelligently waives his right to be free from compulsory self-incrimination and submits to further interrogation should use of his grand jury testimony against him be sanctioned. As I stated in United States v. Mandujano, 425 U. S. 564, 598-600 (1976) (concurring in judgment):
"I would hold that, in the absence of an intentional and intelligent waiver by the individual of his known right to be free from compulsory self-incrimination, the Government may not call before a grand jury one whom it has probable causeas measured by an objective standard to suspect of committing a crime, and by use of judicial compulsion compel him to testify with regard to that crime. In the absence of such a waiver, the Fifth Amendment requires that any testimony obtained in this fashion be unavailable to the Government for use at trial. Such a waiver could readily be demonstrated by proof that the individual was warned prior to questioning that he is currently subject to possible criminal prosecution for the commission of a stated crime . . . ."
In this case, although respondent Washington was advised of his rights to silence and to talk to a lawyer before he appeared before the grand jury, he was "only told that he was needed as a witness in prosecuting the two who were occupants of the van at the time of its impoundment." 328 A. 2d 98, 100 (1974). He was never told that he was in danger of being indicted himself, even though "at the time of his grand jury appearance respondent was a potential defendant whose *193 indictment was considered likely by the prosecution." Ante, at 186 n. 4.
The ancient privilege of a witness against being compelled to incriminate himself is precious to free men as a shield against high-handed and arrogant inquisitorial practices. It has survived centuries of controversies, periodically kindled by popular impatience that its protection sometimes allows the guilty to escape punishment. But it has endured as a wise and necessary protection of the individual against arbitrary power, and the price of occasional failures of justice is paid in the larger interest of general personal security.
I would hold that a failure to warn the witness that he is a potential defendant is fatal to an indictment of him when it is made unmistakably to appear, as here, that the grand jury inquiry became an investigation directed against the witness and was pursued with the purpose of compelling him to give self-incriminating testimony upon which to indict him. I would further hold that without such prior warning and the witness' subsequent voluntary waiver of his privilege, there is such gross encroachment upon the witness' privilege as to render worthless the values protected by it unless the self-incriminating testimony is unavailable to the Government for use at any trial brought pursuant to even a valid indictment.
It should be remarked that, of course, today's decision applies only to application of the privilege against self-incrimination secured by the Fifth Amendment to the United States Constitution.[*] The holding does not affect the authority of state courts to construe counterpart provisions of state constitutionseven identically phrased provisions"to give the individual greater protection than is provided" by the *194 federal provision. State v. Johnson, 68 N. J. 349, 353, 346 A. 2d 66, 67-68 (1975). See generally Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).
A number of state courts have recognized that a defendant or potential defendant called before a grand jury is privileged against the State's using his self-incriminating testimony to procure an indictment or using it to introduce against him at trial, even in the absence of an affirmative claim of his privilege against self-incrimination. See, e. g., People v. Laino, 10 N. Y. 2d 161, 176 N. E. 2d 571 (1961); State v. Fary, 19 N. J. 431, 437-438, 117 A. 2d 499, 503 (1955); Taylor v. Commonwealth, 274 Ky. 51, 118 S. W. 2d 140 (1938); State v. Corteau, 198 Minn. 433, 270 N. W. 144 (1936); Culbreath v. State, 22 Ala. App. 143, 113 So. 465 (1927). See additional cases in Annot., Privilege Against Self-incrimination as to Testimony before Grand Jury, 38 A. L. R. 2d 225, 290-294 (1954). One court has specifically held that interrogating a potential defendant "under [the] guise of examining him as to the guilt of someone else" is a violation of the defendant's privilege against self-incrimination. People v. Cochran, 313 Ill. 508, 526, 145 N. E. 207, 214 (1924). See also Newman, The Suspect and the Grand Jury: A Need for Constitutional Protection, 11 U. Rich. L. Rev. 1 (1976); Comment, The Grand Jury Witness' Privilege Against Self-Incrimination, 62 Nw. U. L. Rev. 207, 223 (1967); Meshbesher, Right to Counsel before Grand Jury, 41 F. R. D. 189, 191 (1966). The rationale of these decisionswhich I would find applicable to the case now before usis that where the grand jury investigation is in fact a proceeding against the witness, or even if begun as a general investigation it becomes a proceeding against the witness, the encroachment upon the witness' privilege requires that a court deny to the prosecution the use of the witness' self-incriminating testimony.
NOTES
[1] With United States v. Mandujano, 425 U. S. 564 (1976), and United States v. Wong, ante, p. 174, we have settled that grand jury witnesses, including those already targeted for indictment, may be convicted of perjury on the basis of their false grand jury testimony even though they were not first advised of their Fifth Amendment privilege against compelled self-incrimination.
[2] This was an obvious overstatement of respondent's constitutional rights; the very purpose of the grand jury is to elicit testimony, and it can compel answers, by use of contempt powers, to all except self-incriminating questions.

After the oral warnings, respondent was also handed a card containing all the warnings prescribed by Miranda v. Arizona, 384 U. S. 436 (1966), and a waiver form acknowledging that the witness waived the privilege against compelled self-incrimination. Respondent signed the waiver.
[3] The Court of Appeals declined to dismiss the indictment, however, relying on a line of cases in this Court holding that an indictment returned by a properly constituted grand jury is not subject to challenge on the ground that it was based on unconstitutionally obtained evidence. See United States v. Calandra, 414 U. S. 338 (1974); United States v. Blue, 384 U. S. 251 (1966); Lawn v. United States, 355 U. S. 339 (1958). Respondent's cross-petition seeking review of this portion of the Court of Appeals' ruling was denied, 426 U. S. 905 (1976), and the validity of the indictment is not an issue in this case.
[4] Though both courts below found no effective waiver of Fifth Amendment rights, neither court found, and no one suggests here, that respondent's signing of the waiver-of-rights form was involuntary or was made without full appreciation of all the rights of which he was advised. The Government does not challenge, and we do not disturb, the finding that at the time of his grand jury appearance respondent was a potential defendant whose indictment was considered likely by the prosecution.
[5] In Miranda, the Court saw as inherently coercive any police custodial interrogation conducted by isolating the suspect with police officers; therefore, the Court established a per se rule that all incriminating statements made during such interrogation are barred as "compelled." All Miranda's safeguards, which are designed to avoid the coercive atmosphere, rest on the overbearing compulsion which the Court thought was caused by isolation of a suspect in police custody. See Oregon v. Mathiason, 429 U. S. 492 (1977); Beckwith v. United States, 425 U. S. 341 (1976); Garner v. United States, 424 U. S. 648, 653-654 (1976); Michigan v. Tucker, 417 U. S., at 444.
[6] Although the District of Columbia Court of Appeals rested its holding solely on the Self-Incrimination Clause of the Fifth Amendment, respondent urges the Fifth Amendment Due Process Clause. He contends it is fundamentally unfair to elicit incriminating testimony from a potential defendant without first informing him of his target status. This, it is argued, would alert the witness more pointedly so as to enable him to decide whether to invoke the privilege against compelled self-incrimination. This line of argument simply restates respondent's claims under the Self-Incrimination Clause and is rejected for the same reasons. Moreover, there is no evidence of any governmental misconduct which undermined the fairness of the proceedings.
[*] Of course, it is still open to the District of Columbia Court of Appeals, under its supervisory powers, on remand to order and enforce compliance with what it considers proper procedures before the grand jury, Ristaino v. Ross, 424 U. S. 589, 597 n. 9 (1976); United States v. Jacobs, 547 F. 2d 772 (CA2 1976), cert. pending, No. 76-1193.