CALLAHAN, Circuit Judge,
with whom, O’SCANNLAIN, TALLMAN, BE A, and IKUTA, Circuit Judges, join, dissenting from the denial of rehearing en banc:
Fifteen-year-old Adrian Reyes confessed to killing sixteen-year-old Derek Ochoa in a drive-by shooting. He first confessed after acknowledging many times that he was not under arrest and was not required to talk, freely leaving two previous police interviews, taking a polygraph that he and his parents not only consented to but that Reyes initially suggested, and then asking to speak with detectives. After Reyes confessed, those detectives drove him to another location where they told him that he was no longer free to leave and read him his Miranda rights. He again confessed. A jury found Reyes guilty of first-degree murder. The state appellate court affirmed, the California Supreme Court denied Reyes’s petition for review, and the U.S. Supreme Court denied certiorari. In a supreme display of Ninth Circuit legerdemain, the panel majority reviewed de novo, found that Reyes’s confession was obtained in violation of Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 169 L.Ed.2d 643 (2004), and thus reversed the district court’s denial of habeas relief. The panel truly conjured its magic from nothing — the panel did not watch the videos of the police interviews, Reyes argued to the state appellate court that a deliberate Miranda violation was not at issue, and Reyes never mentioned Seibert in federal court until the panel told him to.
Like the district court and state court judges, I disagree with the panel, which makes three errors of exceptional importance. First, the panel wrongly concludes that Justice Kennedy’s subjective-intent requirement in Seibert, which seven other Justices rejected, is clearly established Supreme Court law. Second, the panel wrongly permits federal courts to read the worst into state court decisions on habeas review. Third, the panel wrongly requires all courts to presume the worst of police officers in applying Seibert. The panel’s decision not only misunderstands Seibert, conflicts with our recent en banc decisions, and creates circuit splits, but also threatens to interfere with reasonable police work and let a confessed murderer walk.
I respectfully dissent from this court’s failure to rehear this case en banc.
I.
This case’s background is important to understanding how far the panel strayed from the scope of its review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). While the panel’s coverage of this background is incomplete in other respects, I will only supplement the panel’s depiction of Reyes’s third police interview and this case’s procedural history.
A. Factual background
Police officers questioned Reyes about Ochoa’s murder on January 13, 2006, February 9, 2006, and February 10, 2006. Reyes was told that he was not under arrest at the first two interviews, and he left both interviews free. At the February 9th interview, Reyes offered to take a polygraph test.
The following day, Reyes voluntarily returned to the San Bernardino County Sheriffs station to take the polygraph test. Reyes’s parents consented to the test, which Robert Heard, the San Bernardino Sheriffs polygrapher, administered. Heard first explained at great length that Reyes was not under arrest, and Reyes responded that he understood. Heard noted that Reyes’s parents had given permission for Reyes to take the test but emphasized that *1005 “[t]he decision on whether or not Adrian is gonna take a polygraph exam is with Adrian. That’s your decision. Okay?” Heard reiterated, “After we talk or at any time you can say you know what Bob? I ain’t spillin’, I don’t wanna talk to you anymore. I wanna go. Just say so. You’re out a here, you’re gone, you with me?” Reyes said he understood. Heard walked Reyes through a consent form in detail. Reyes read part of the form aloud, stating “I understand that I cannot be forced to take this test. And you know what? I have the right at any time to leave ... my examination room.” Reyes confirmed that he understood the consent form and signed it.
After several “dry runs” during which Reyes contradicted his previous narrative by placing himself in the silver Toyota Camry involved in the shooting near the scene and time of Ochoa’s murder, Reyes took the polygraph and denied involvement in the murder. Heard told Reyes that he failed the test. Heard continued questioning, appealed to the importance of telling the truth, and suggested that Reyes tell him if there were any mitigating circumstances. Reyes stated a few times that he didn’t want to talk any more during the questioning that followed, but he never sought to end the interview and leave. Reyes asked what would happen if he didn’t say anything. Heard responded that the investigation would continue — “They!re gonna work it, and they’re gonna put it together.” Reyes later said he didn’t want to talk “cause even if I say anything or if I don’t, everybody[ ] that they got on the list is gonna do 25 years prison.” Reyes asked, “So if I say who the shooter was, I’m still gonna go to jail?” Heard responded more than once that he did not have an answer to that question, though Heard had previously stated that fifteen-year olds don’t go to state prison.
Reyes asked for some time and Heard offered to wait outside, but Reyes then said “No, it’s alright.” After Heard asked another question, Reyes responded “not that I know, you know, so don’t ask any question.” Heard asked Reyes if he wanted to be alone, and Reyes responded “No, it’s just, just don’t ask any questions.” When Heard said he was not just going to sit there and do nothing, Reyes asked, “Can we just call the detectives?”
Shortly thereafter, in the same room, Detectives Brandt and Medici questioned Reyes. When Brandt asked whether Reyes was in the front passenger seat, Reyes stated “No, I’ll say nothing, man.” Reyes refused to identify the other person in the car and stated that “we’re still gonna do time in jail anyway.” Detective Brandt responded that the jail time “may be minimal or it, it may be a lot, but like we told you yesterday, uh, people have, you have to tell the, the truth.” Detective Brandt later asked Reyes how many 15-year olds he knew that went to jail for 25 years and why Reyes would be any different. Later in the interrogation, however, Reyes continued to acknowledge that he would do “25 years to life” if he shot Ochoa.
Not long after the Detectives began questioning, Reyes confessed that he shot Ochoa: “I just shot.” As Ochoa approached the car, Reyes felt afraid and “got mad. [He] opened the door so he would like back up.” Then he shot. As the panel majority observes, “Reyes’s statement that he had shot Ochoa came early in the interview, on the seventh page of the transcript.” Maj. Op. 1021. After this confession, the detectives continued questioning and tried unsuccessfully to determine who else was involved.
After the interview at the San Bernardi-no Sheriffs station concluded, Detective Brandt drove Reyes back to the Riverside police station where Detectives Brandt and Medici again questioned Reyes. It is unclear how much time passed, but the panel *1006 states that the station was 15 miles away. At the beginning of the interview, Brandt explained that Reyes was no longer free to leave and thus Brandt was required to read Reyes his Miranda rights. After reading him his rights, Brandt then asked if they could “talk about stuff we talked about earlier today?” Reyes said yes. In the interrogation that followed, the detectives did not use the earlier interview to impeach Reyes. The only reference back was to an earlier statement by Reyes that Ochoa had thrown something at the car. Reyes admitted to shooting Ochoa but said Ochoa looked like he also had a gun.
B. Procedural background
Reyes was charged in California Superi- or Court with first-degree murder. At the outset of the trial, Reyes sought to suppress the statements he had made to law enforcement on February 10, 2006. Following an evidentiary hearing, the trial judge suppressed the statements Reyes made before being advised of his Miranda rights, finding that Reyes had been in custody. The trial judge did not suppress the post-warning statements. The jury found Reyes guilty of first-degree murder with gang and firearm enhancements.
Reyes appealed, claiming, among other things, that the trial court erred in admitting his post-warning confession. Reyes argued that “the coercive atmosphere of the involuntary statements was never dissipated” and that the “admonition of rights was too little, too late.” He did not argue that the detectives deliberately violated Miranda. In fact, Reyes argued at length in his reply brief in the state appellate court that the State had incorrectly characterized Seibert as requiring “coordinated interrogation tactics designed to produce an unwarned confession.”[1] In other words, according to Reyes, whether the officers deliberately employed a two-part interrogation tactic designed to undermine the import of subsequent Miranda warnings was not at issue. Rather, the operative question, according to Reyes himself, was whether “appellant’s post-polygraph statements were voluntary,” and, if not, “whether the taint from the involuntary admissions was dissipated before the sta-tionhouse admissions were made.”
The state appellate court affirmed in a lengthy, reasoned decision. People v. Reyes, No. D047521, 2010 WL 3026227 (Cal. Ct. App. Aug. 4, 2010). Because it was uncontested that the detectives did not violate Miranda in bad faith, the state appellate court agreed with Reyes on the relevant legal inquiry. The court explained, “[A]s defendant recognizes, the fact the interrogation at the sheriffs station was not accompanied by Miranda advisals does not invalidate the later Mirandized statements unless the later admissions were in fact involuntary or the tainted product of the initial statements or confession.” Id. at *12. Applying this standard, the court determined that Reyes’s pre- and post-warning confessions were voluntary and thus the post-warning confession was admissible. The court distinguished Seibert, explaining that “the circumstances in the instant case need not ‘be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a *1007 reasonable person in the suspect’s shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk.’” Id. at *13 (alteration in original) (quoting Seibert, 542 U.S. at 616, 124 S.Ct. 2601 (plurality opinion)).
Reyes sought review of the state appellate court’s decision by the California Supreme Court. In his briefs before the California Supreme Court, Reyes did not mention Seibert. The California Supreme Court denied his petitions. The U.S. Supreme Court denied certiorari.
Reyes then filed a petition for habeas corpus in federal district court. In his briefs below, he again did not mention Seibert. Magistrate Judge Eick issued a 53-page report and recommendation that relief be denied. District Judge Feess adopted the report in full. Consistent with Reyes’s arguments, and like the state appellate court, the district court focused on whether a reasonable jurist could conclude that Reyes’s confessions were voluntary. However, the district court raised and distinguished Seibert because “there is no evidence that the law enforcement officers deliberately applied a two-step method, and the state courts reasonably concluded that Petitioner’s post-warning statements were voluntarily made.”
Reyes then appealed to the Ninth Circuit. On appeal, he did not cite Seibert or take issue with the district court’s conclusion that the detectives had not employed a two-part interrogation in deliberate violation of Miranda. The panel nonetheless ordered “supplemental briefing on the applicability of [Seibert] to this case.” Reyes’s supplemental brief marked the first time that he clearly argued that the officers’ “failure to warn ... was not made in good faith and was ... a deliberate attempt to deprive him of his constitutional rights.” The panel reviewed de novo the Seibert argument that it directed Reyes to make and, after engaging in appellate fact-finding on a record that did not even include the videos of the police interviews, found it persuasive.[2] The panel thus reversed the district court’s denial of habeas relief and ordered that relief be granted if Reyes is not retried for Ochoa’s now ten-and-a-half-year-old murder.
II.
In reversing the district court’s denial of habeas relief, the panel committed three critical errors, any one of which should have prompted en banc review.
A. The panel wrongly concluded that Justice Kennedy’s lone concurrence in Seibert is clearly established Supreme Court law.
The panel’s amended opinion holds that Justice Kennedy’s lone concurrence in Sei-bert is clearly established law under the reasoning-based approach to applying Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). We recently adopted the reasoning-based or “common-denominator-of-the-reasoning rule” in United States v. Davis, 825 F.3d 1014 (9th Cir.2016) (en banc). In Davis, we concluded that Justice Sotomayor’s concurrence in Freeman v. United States, 564 U.S. 522, 131 S.Ct. 2685, 180 L.Ed.2d 519 (2011), was not controlling under the reasoning-based rule because the Freeman plurality and dissent explicitly rejected the concurrence’s reasoning. Davis, 825 F.3d at 1022 (“The Freeman plurality explicitly rejected the concurrence’s reasoning.”); id. at 1025 (“The Freeman dissent is similarly critical of Justice Sotomayor .... ”); see also id. (emphasizing that “Justice Soto- *1008 mayor explicitly” rejected the dissent’s rule). We concluded that “[t]his fundamental divergence in reasoning is enough to demonstrate that Justice Sotomayor’s rationale is not controlling Supreme Court law.” Id. at 1022. We explained that this conclusion is reinforced by the fact that there may be cases where relief would be granted under the concurrence’s rule but not the plurality’s rule. Id. at 1022-23.
Applying the common-denominator-of-the-reasoning Marks rule to Seibert, other circuit courts have found that Justice Kennedy’s Seibert concurrence is “obviously not the ‘common denominator’ that Marks was talking about.” United States v. Heron, 564 F.3d 879, 883-87 (7th Cir. 2009); see also United States v. Ray, 803 F.3d 244, 270-72 (6th Cir. 2015). Just as the plurality and dissent expressly rejected elements of Justice Sotomayor’s reasoning in Freeman, the plurality and dissent expressly (and even more emphatically) rejected Justice Kennedy’s reasoning in Sei-bert. As the Sixth Circuit explained, “three of the four Justices in the plurality and the four dissenters decisively rejected any subjective good faith consideration, based on deliberateness on the part of the police.”[3] Ray, 803 F.3d at 271 (quoting United States v. Rodriguez-Preciado, 399 F.3d 1118, 1139-41 (9th Cir. 2005) (Berzon, J., dissenting)); see also United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006). Under the reasoning-based Marks rule, reasoning expressly rejected by at least seven Justices cannot be elevated to the status of controlling Supreme Court law.
As in Davis, this conclusion is reinforced by the fact that there are likely to be cases where relief would be granted under Justice Kennedy’s test but not the plurality’s test. The plurality’s test is concerned with the effectiveness of the belated Miranda warnings. The plurality looks to “the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator’s questions treated the second round as continuous with the first.” Seibert, 542 U.S. at 615, 124 S.Ct. 2601. These and other objective facts are relevant to assessing whether “a reasonable person in the suspect’s shoes would [ ] have understood [the Miranda warnings] to convey a message that she retained a choice about continuing to talk.” Id. at 617, 124 S.Ct. 2601. By contrast, Justice Kennedy looks first to whether the police deliberately violated Miranda and, if so, whether the officers used “curative measures ... before the postwarning statement is made,” such as “an additional warning that explains the likely inadmissibility of the prewarning custodial statement.” Id. at 622, 124 S.Ct. 2601.
There are likely to be cases involving deliberate Miranda violations where most of the plurality’s “effectiveness factors” are met but, because no explanation of the *1009 prewarning statement’s inadmissibility or other “specific, curative step” was taken, Justice Kennedy’s curative measures requirement isn’t. Similarly, there are likely cases involving deliberate violations where Justice Kennedy’s curative-measures requirement is met because “specific, curative steps” were taken, such as a warning that the pre-Miranda confession could not be used against the suspect, but the plurality’s effectiveness requirement isn’t. For example, the plurality’s effectiveness requirement may not be satisfied because of “the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, [and] the continuity of police personnel.” Id. at 615, 124 S.Ct. 2601.
It is true that some courts have held that Justice Kennedy’s concurrence is controlling. However, just as the Davis opinion observed in distinguishing other circuits’ treatment of Freeman, all of these courts “engage with Marks only superficially, quoting its language with no analysis,” Davis, 825 F.3d at 1024, and apparently applying a results-based Marks rule.[4] It is clear that the panel’s amended opinion creates an additional circuit split on how the reasoning-based Marks rule applies to Seibert. See Ray, 803 F.3d at 267-73; Heron, 564 F.3d at 883-87.[5]
Evidently, the upshot of our en banc decision in Davis is that fractured Supreme Court decisions like Seibert are binding on state courts but not on us. But the panel’s conclusion that Seibert is binding on state courts is even more questionable under AEDPA. At the very least, the “fair-minded disagreement” between circuit courts on whether Seibert created any controlling rule, shows that Justice Kennedy’s deliberateness requirement is not “clearly established law” within the meaning of AEDPA.[6] See White v. Woodall, — U.S. -, 134 S.Ct. 1697, 1703, 188 L.Ed.2d 698 (2014); Harrington v. Richter, 562 U.S. 86, 102-03, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).
B. The panel violated AEDPA by presuming that the state appellate court did not understand and follow clearly established law.
Even if Justice Kennedy’s concurrence were clearly established Supreme Court law, the panel violated AEDPA. The panel majority deemed itself unfettered by AEDPA because, in its view, the state appellate court’s decision did not expressly make a finding regarding the deliberate *1010 ness element of Justice Kennedy’s test in Seibert. However, the state appellate court’s decision is readily reconciled with Seibert.
First, several parts of the state appellate court’s decision may be read to acknowledge expressly that the detectives did not deliberately violate Miranda. The court found “no evidence that defendant was coerced into waiving his rights,” and explained that Detective Brandt “advise[d] [Reyes] of his Miranda rights before questioning him further” at the police station because Brandt no longer regarded Reyes as being “free to leave.” Reyes, 2010 WL 3026227, at *6, 13. The state appellate court also distinguished People v. Neal, 31 Cal.4th 63, 80-81, 1 Cal.Rptr.3d 650, 72 P.3d 280 (2003), “in which a police detective intentionally continued interrogation in deliberate violation of Miranda.” Id. at *9. Moreover, the state court’s decision tacitly acknowledges, as the record confirms, that Reyes did not even contend that the officers violated Miranda in bad faith. The court explained that, accordingly, “as defendant recognizes, the fact the interrogation at the sheriffs station was not accompanied by Miranda advisals does not invalidate the later Mirandized statements unless the later admissions were in fact involuntary or the tainted product of the initial statements or confession.” Id. at *12 (emphasis added). This is the correct inquiry under Justice Kennedy’s Seibert test in cases where it is undisputed that the officers did not violate Miranda in bad faith.[7]
The panel does not attempt to address this textual evidence that the state court correctly understood the law. In any case, such parsing of sentences in the state court’s decision takes us beyond our role under AEDPA. Even if the decision were silent or ambiguous on whether the detectives deliberately violated Miranda, de novo review is still foreclosed. Under controlling Supreme Court precedent, we must presume “state courts know and follow the law,” give state courts “the benefit of the doubt,” and make an “effort to reconcile” the reasoning of state courts with controlling Supreme Court rules. Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002); see also Renico v. Lett, 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010); Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); Poyson v. Ryan, 743 F.3d 1185, 1199 (9th Cir. 2013), as amended (Apr. 2, 2014) (“AEDPA does not allow us to presume from an ambiguous record that the state court applied an unconstitutional standard.”), overruled on other grounds by McKinney v. Ryan, 813 F.3d 798 (9th Cir. 2015) (en banc). Like its first major error, the panel’s second error also conflicts with a recent en banc decision of this court. The panel majority’s reasoning is clearly irreconcilable with our rule in Mann v. Ryan, 828 F.3d 1143, 1158, 2016 WL 3854234, at *11 (9th Cir. July 15, 2016) (en banc), that if “we can read the [state court] decision to comport with clearly established federal law, we must do so.”
Second, as Judge Singleton explained in his concurrence in this ease, the state court’s analysis can also be reconciled with Seibert if the decision is read to have found that the Miranda warnings were effective.
*1011 The state court made the following finding in distinguishing Seibert:
Unlike in Missouri v. Seibert (2004) 542 U.S. 600, 616, 124 S.Ct. 2601, 159 L.Ed.2d 643, the circumstances in the instant case need not “be seén as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect’s shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk.” (Id. at p. 616, 124 S.Ct. 2601.)
Reyes, 2010 WL 3026227, at *13. This finding of effectiveness provides an additional ground for distinguishing Seibert, even assuming that the detectives deliberately violated Miranda. Under either ground, the panel majority erred in “freeing] itself from AEDPA’s strictures.” Keman v. Hinojosa, — U.S. -, 136 S.Ct. 1603, 1605, 194 L.Ed.2d 701 (2016) (per curiam). As explained below, we need not reach the question whether the state appellate court’s effectiveness finding was an objectively unreasonable application of Seibert because a reasonable jurist could conclude that any Miranda violation was unintentional.
C. The panel wrongly presumed that the police violated Miranda in bad faith, and conflated the deliberateness of a Miranda violation with the effectiveness of a subsequent Miranda warning.
Even if de novo review were appropriate, the panel’s decision misinterprets Sei-bert and creates bad law on how courts should assess whether police officers deliberately violated Miranda.
The panel begins its analysis of whether the detectives deliberately violated Miranda by stating, “ ‘the most plausible reason’ for delaying Miranda warnings until after a suspect has confessed ‘is an illegitimate one, which is the interrogator’s desire to weaken the warning’s effectiveness.’” Maj. Op. 1030 (quoting United States v. Williams, 435 F.3d 1148, 1159 (9th Cir. 2006)). The panel’s presumption of bad faith is contrary to Justice Kennedy’s concurrence in Seibert, effectively overrules Elstad, and removes a habeas corpus petitioner’s burden of proving a constitutional violation. See Thompson v. Runnels, 657 F.3d 784, 788-91 (9th Cir.) (Callahan, J., dissenting from denial of rehearing en banc) (explaining that “contrary to the majority’s assertion, ... Seibert did not overrule Elstad'’), vae’d sub nom. McEwen v. Thompson, — U.S. -, 132 S.Ct. 578, 181 L.Ed.2d 418 (2011).
As the State points out, nothing in Sei-bert “suggests that it is necessary or proper to presume wrongdoing on the part of police.” Justice Kennedy explained that his test would apply only “in the infrequent case” where detectives deliberately violated Miranda. Seibert, 542 U.S. at 622, 124 S.Ct. 2601. He emphasized that in most cases “[t]he admissibility of postwarning statements should continue to be governed by the principles of Elstad.” Id. He “suggested a number of plausible reasons why an officer might legitimately wait to deliver Miranda warnings, including that ‘[a]n officer may not realize that a suspect is in custody and warnings are required.’” United States v. Stewart, 536 F.3d 714, 720 (7th Cir. 2008) (alteration in original) (quoting Seibert, 542 U.S. at 620, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment)).
Other circuits have rightly refused to presume that police officers act in bad faith. See, e.g., id. at 720-21; Carrizales-Toledo, 454 F.3d at 1153 (concluding that there was no deliberate two-step interrogation because “it is likely that [the officer] failed to provide the Miranda warning because at that point it was unclear whether [the suspect] was in custody”). Indeed, *1012 the Supreme Court has admonished that “the task of defining ‘custody’ is a slippery one, and police [officers] investigating serious crimes [cannot realistically be expected to] make no errors whatsoever.” Elstad, 470 U.S. at 309, 105 S.Ct. 1285 (second alteration in original). Where police officers engrossed in the moment mistake the difficult line between custodial and noncustodial interviews, we will not suppress subsequent warned and voluntary “admissions of guilt by wrongdoers, [which] are inherently desirable.” Id. at 305, 105 S.Ct. 1285 (quoting United States v. Washington, 431 U.S. 181, 187, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977)).
The panel also misconstrued Seibert, collapsed the plurality and concurrence’s tests, and effectively overruled Elstad by conflating the issue of whether the detectives deliberately violated Miranda with the issue of whether the midstream-Afi-randa warning was effective. The majority found indicative of deliberateness the facts that the pre-warning and post-warning confessions overlapped in content, the detectives did not take specific curative measures, and there was overlap in personnel. These facts do not pertain to the subjective intent of the detectives; they pertain to assessing whether “a reasonable person in the suspect’s shoes would ... have understood [the midstream-Afircmda. warnings] to convey a message that she retained a choice about continuing to talk.” Seibert, 542 U.S. at 617, 124 S.Ct. 2601 (plurality opinion).
At best, such evidence is neutral on whether detectives deliberately violated Miranda. For example, the fact that “Reyes provided essentially the same information,” Maj. Op. 1031, during the warned and unwarned interrogations has little bearing on whether the detectives deliberately violated Miranda. Of course Reyes’s pre-warning confession to murdering Ochoa overlapped with his post-warning confession to murdering Ochoa. How could it be otherwise? If “there was no earlier confession to repeat,” Seibert would not apply and we would not need to consider deliberateness. Bobby v. Dixon, — U.S. -, 132 S.Ct. 26, 31, 181 L.Ed.2d 328 (2011) (per curiam). Similarly, the fact that “Brandt did not take curative measures,” Maj. Op. 1031, is relevant to whether the midstream-Afmmda warning was effective. But this fact does not show that detectives who clearly endeavored to create a non-custodial interview employed a two-part interrogation in deliberate violation of Miranda. If the detectives thought the pre-warning interview was non-custodial, then they would have thought such “corrective measures” to have been unnecessary. The panel’s view that Brandt “played down” the importance of the Miranda warnings by stating that he wanted “just to clarify stuff,” id. also is relevant to whether the midstre&m-Miranda warning was effective. But such statements do not establish a deliberate Miranda violation. Again, if the detectives thought the pre-warning interview was non-custodial, they would have seen no problem with referencing it. As Justice Kennedy noted, “Skilled investigators often interview suspects multiple times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection.” Seibert, 542 U.S. at 620, 124 S.Ct. 2601.
The panel also found the fact that the “three Riverside police officers involved in the case — Brandt, Wheeler and Medici— were all experienced officers” to evidence a deliberate Miranda violation. Maj. Op. 1031. But the fact that the officers were seasoned is just as likely to evidence that they understood Miranda and endeavored to keep the interview non-custodial. Similarly, the fact that the detectives “obtained the incriminating information from Reyes very early in the unwarned custodial inter *1013 rogation,” Maj. Op. 1032, does not evidence a deliberate Miranda violation. Rather, that Reyes quickly confessed once the detectives entered, at Reyes’s request, shows that the officers would have had little reason to believe that Reyes no longer felt free to leave and thus that the interview had become custodial.
Inexplicably, the panel went as far as to attribute bad faith to the detectives because they questioned Reyes “in a non-confrontational, sympathetic way, with the result that Reyes was made to feel ... comfortable ... and laugh[ ].” Id. As explained below, this fact and many others that the panel ignored show that a reasonable jurist could find that the detectives did “not realize that [the] suspect [was] ip custody and warnings [were] required,” which is a good-faith reason for not delivering Miranda warnings earlier. Seibert, 542 U.S. at 620, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment).
D. The state appellate court and federal district court correctly found that the detectives did not deliberately violate Miranda and that Reyes’s post-warning murder confession was admissible.
Under AEDPA, the state court’s determination that no Miranda violation occurred is entitled to deference and should be upheld as long as “fairminded jurists could disagree” on the correctness of the state court’s decision. Harrington, 562 U.S. at 101, 131 S.Ct. 770. Even if de novo review applied' here, however, the panel erroneously concluded that the detectives deliberately violated Miranda. The weight of objective and subjective evidence favors the view that the reason that the pre-warning interview was unwarned is that the officers believed that Reyes was not in custody. After all, Reyes was repeatedly told that he was not under arrest and was free to leave, left two previous interviews free, requested the polygraph interview, consented to it verbally and in writing, and then asked to speak to the detectives after its conclusion. Under applicable case law, these facts and many others weigh strongly in favor of the view that the officers reasonably viewed the pre-warning interview to have been non-custodial.
For example, following the Supreme Court, “[w]e have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time,” United States v. Bassignani, 575 F.3d 879, 886 (9th Cir. 2009), as the officers here repeatedly told Reyes.[8] Courts have also consistently held that the fact that a defendant came to the police station voluntarily, as Reyes did here, weighs in favor of the view that he was not in custody. Beheler, 463 U.S. at 1122, 103 S.Ct. 3517 (noting that the suspect “voluntarily agreed to accompany police to the station house”).[9] Courts have also held that the fact that a defendant consented in writing to a polygraph test, as Reyes did here, is powerful evidence *1014 that the defendant was not in custody. People v. Ochoa, 19 Cal.4th 353, 402, 79 Cal.Rptr.2d 408, 966 P.2d 442 (Cal. 1998).
Still other objective facts support the view that the detectives reasonably believed that Reyes did not view himself to be in custody. For example, the detectives released Reyes after two previous interviews. See, e.g., Beheler, 463 U.S. at 1122, 103 S.Ct. 3517 (emphasizing that “Beheler was permitted to return to his home”). The officers did not restrain Reyes in the exam room or yell at him. They permitted Reyes to give narrative answers and “appealed to his interest in telling the truth and being helpful.” Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). These are all signs that the officers endeavored to keep the pre-warning interview non-custodial, not to violate Miranda in bad faith.
Moreover, the panel concedes that there is no subjective evidence that the detectives deliberately violated Miranda. There is, however, subjective evidence that they did not. As the state appellate court observed, Detective Brandt stated before giving the Miranda warnings that the warnings were now required because Reyes was no longer free to leave. Reyes, 2010 WL 3026227, at *6. The clear implication is that Detective Brandt did not believe that the warnings were required earlier because he believed the earlier interview was non-custodial.
It is true that some circumstances were indicative of custody and thus lend some support to the view that the officers knew that the pre-warning interview had turned custodial. In its analysis, the panel oddly does not mention the strongest of such evidence, that Reyes intermittently stated that he did not want to answer particular questions. Reyes, however, never sought to terminate the interview and leave. Especially given that Reyes had previously acknowledged many times that he could terminate the interview and leave, and had left two previous interviews free after intermittently declining to answer questions, the fact that the officers continued questioning him is not dispositive of a deliberate Miranda violation. Moreover, as the state appellate court emphasized, Officer “Heard ultimately terminated the postpo-lygraph questioning upon defendant’s request.” Id. at *8. Reyes then asked to speak with the detectives, not to leave. Indeed, the transcripts suggest that Reyes remained because he was fishing for a deal.
Similarly, I cannot conclude on AEDPA or clear error review that the officers employed a two-part interrogation in deliberate violation of Miranda simply because the officers questioned Reyes’s veracity, confronted him with evidence of his guilt, and suggested leniency. See, e.g., Mathiason, 429 U.S. at 493, 97 S.Ct. 711 (officers told the suspect that his fingerprints had been found at the scene and that “his truthfulness would possibly be considered by the district attorney or judge”); Stansbury v. California, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (telling a person he is a “prime suspect” does not necessarily mean he is under arrest because “some suspects are free to come and go until the police decide to make an arrest”).
Again, this is not to say that the pre-warning interview could not reasonably be viewed as custodial; that 20-20 hindsight legal conclusion made by judges is not at issue. What is at issue is whether officers engrossed in the moment knew that the interview had become custodial but deliberately pressed on to undermine the effect of subsequent Miranda warnings. It bears repeating that Miranda warnings need be given only once a suspect is in custody. There is nothing wrong with officers seeking to question a suspect in a non-custodial *1015 situation. Rather, this may be viewed as good police work. So long as the officers believed that the interview remained noncustodial, where they turned out to be mistaken, a subsequent, warned confession must be allowed into evidence if voluntarily given. Here, a reasonable jurist could conclude, as did the state appellate court and the district court, that the detectives did “not realize that [Reyes was] in custody and warnings [were] required.” See Seibert, 542 U.S. at 620, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment).
Because any Miranda violation by the detectives was not deliberate, the operative question under de novo review, as the state courts, the district court, the prosecution, and Reyes correctly recognized, is whether Reyes’s post-warning confession is admissible under Elstad. Under Elstad, “[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made.” Elstad, 470 U.S. at 318, 105 S.Ct. 1285. The state appellate court and the district court explained in detail why both the pre-warning and post-warning confessions were voluntary, and thus the post-warning confession was admissible. Reyes, 2010 WL 3026227, at *8-14. I will not repeat those courts’ exhaustive analyses here. I note only that the state appellate court’s conclusion that Reyes’s confessions were voluntary must be given even “more leeway” on AEDPA review given the inquiry’s open-ended nature. See Alvarado, 541 U.S. at 664, 124 S.Ct. 2140; Harrington, 562 U.S. at 102, 131 S.Ct. 770 (“[E]ven a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.”). The panel majority has not conducted this inquiry, which should have been the focus of its analysis from the start given the absence of bad faith by the detectives.[10]
III.
The panel’s decision conflicts with AED-PA, Supreme Court precedent, other circuits’ precedent, our recent en banc decisions, and Seibert itself. Moreover, the panel is wrong in finding that Detective Brandt, Detective Wheeler, and Officer Heard violated Miranda in bad faith. Our failure to go en banc has consequences. Courts in our circuit will be permitted to read the worst into state court decisions and required to presume the worst of police officers in assessing whether a confession was constitutionally obtained. Reasonable police work will be disrupted. The decision effectively forces officers to tell wrongdoers that their pre-warning admissions may not be used against them, even where the officers do not believe that the pre-warning interview had become custodial. The State will be required to retry a *1016 confessed murderer to secure justice. Its ability to succeed is uncertain given the decade that has passed since Ochoa’s murder.
For these reasons, I dissent from our failure to take this case en banc.

. The State had argued in its answering brief that there was no Miranda violation and that Seibert was distinguishable because, among other reasons, "[tjhere was no evidence of a police policy of coordinated tactics designed to produce an un-warned confession.” In one paragraph of his state habeas petition, Reyes argued that some tactics that the officers used, namely sneering and refusing to "respect petitioner’s efforts to end the interrogation,” were "deliberate” and "flagrant” misconduct. But he did not argue that the officers employed a two-part interrogation in deliberate violation of Miranda, even after the State had addressed this issue.

. The state appellate court and district court referenced videos of the interviews, but none was included in the record. Reyes, 2010 WL 3026227, at *6.

. See Seibert, 542 U.S. at 616 n.6, 124 S.Ct. 2601 (plurality opinion) ("[T]he focus is on facts apart from intent ....”); id. at 623, 124 S.Ct. 2601 (O’Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer.”); id. at 624, 124 S.Ct. 2601 ("The plurality's rejection of an intent-based test is also, in my view, correct.”); id. at 625-26, 124 S.Ct. 2601 ("[R]ecognizing an exception to [Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)] for intentional violations would require focusing constitutional analysis on a police officer’s subjective intent, an unattractive proposition that we all but uniformly avoid.”); id. at 626-27, 124 S.Ct. 2601 ("[T]he approach espoused by Justice Kennedy is ill advised .... This approach untethers the analysis from facts knowable to, and therefore having any potential directly to affect, the suspect.”).

. United States v. Carter, 489 F.3d 528, 535-36 (2d Cir. 2007) (without mentioning Marks, summarily ruling that Seibert established an exception to Elstad); United States v. Torres-Lona, 491 F.3d 750, 758 (8th Cir. 2007) (concluding without explanation that Justice Kennedy's concurrence is controlling because it is "narrower”); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006) (same); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006) (same); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005) (same); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005) (same).

. The Tenth Circuit similarly questioned whether Seibert established a controlling rule, but found it unnecessary to reach the issue. Carrizales-Toledo, 454 F.3d at 1151. The First and D.C. Circuits have also expressed skepticism. United States v. Straker, 800 F.3d 570, 617 (D.C. Cir. 2015); United States v. Verdugo, 617 F.3d 565, 575 (1st Cir. 2010).

.The panel’s statement that the Sixth Circuit found the Seibert plurality opinion controlling in Ray is wrong. In Ray, the Sixth Circuit found that Seibert did not establish a controlling rule, and then chose to adopt as binding the rule articulated by the four-Justice plurality. Ray, 803 F.3d at 272. The panel fails to understand that a fractured Supreme Court decision that did not establish a controlling rule is not clearly established Supreme Court law under AEDPA.

. The panel fundamentally misses the point of Seibert and Elstad in arguing that "that the test for admissibility of a confession is not whether it was voluntary [but] whether it was taken in violation of Miranda.” Concurrence at 1003. Again, even where a pre-warning interview was custodial and thus administered in violation of Miranda, a post-warning confession remains admissible under Justice Kennedy's concurrence so long as the officers did not deliberately violate Miranda and the confession was voluntary.

. See also Howes v. Fields, - U.S. -, 132 S.Ct. 1181, 1185, 182 L.Ed.2d 17 (2012) (“Most important, respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave ....”); California v. Beheler, 463 U.S. 1121, 1122, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam); Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc) ("Perhaps most significant for resolving the question of custody, Defendant was expressly told that he was not under arrest .... ”); Dyer v. Hornbeck, 706 F.3d 1134, 1136-40 (9th Cir. 2013); United States v. Norris, 428 F.3d 907, 912 (9th Cir. 2005).

. See also Mathiason, 429 U.S. at 495, 97 S.Ct. 711 ("He came voluntarily to the police station ....’’); Crawford, 372 F.3d at 1059 (emphasizing that the defendant “agreed to accompany” the officers).

. The panel suggests that Reyes might not have been the triggerman, noting that two witnesses testified that the driver was the shooter. This suggestion not only epitomizes the type of second-guessing by our court that AEDPA is designed to limit, but also inaccurately characterizes the record. One of these two witnesses stated that the initial shots that hit Ochoa came from inside the car and then the driver stepped around the car and fired additional shots. Another witness testified that he heard gunshots and then saw a passenger get out of the back of the car and approach Ochoa. All of this, of course, went to the jury, but the panel apparently thinks itself capable of finding facts based on an incomplete, cold record. The panel’s suggestion that Reyes was an innocent passenger who took the fall for his older cousin is further undercut by the fact that Reyes voluntarily confessed after acknowledging several times that he would do “25 years to life” for shooting Ochoa. Moreover, Reyes’s guilt is beyond reasonable dispute. The evidence presented at trial shows overwhelmingly that Reyes and his cousin set out in Reyes’s aunt's car to exact revenge on a rival neighborhood in retaliation for an assault on Reyes the previous day. They came across Ochoa and killed him in a drive-by as he waited outside of his house for his parents to take him to school.